[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION RE: MOTION TO STRIKE
In this case a motion to strike has been filed by the defendant against each count of the amended complaint based on a CT Page 14646 claim that they are legally insufficient. A similar claim is made as to the second prayer for relief which makes a claim for exemplary damages. The rules to be applied in deciding a motion to strike are well-known, every favorable inference must be given to the pleadings of the non-moving party, Amodio v. Cunningham,182 Conn. 80, 82 (1980).
First and Second Counts
The first count alleges the defendant offered the plaintiff the job of Manager of Marketing and agreed to pay her "a salary and bonus, and to provide insurance, pension and profit sharing retirement benefits." The plaintiff accepted the job in June 1995 and "faithfully performed all of her duties." The first count goes on to allege that unlawfully and in bad faith the defendant discharged the plaintiff from her position on October 7, 1997 and since then has prevented her from performing her duties. Paragraph 5 goes on to state that the defendant unlawfully discharged her "in order to avoid paying her bonus and other fringe benefits, in violation of the public policy" of our state.
As a result of this it is further alleged that the plaintiff has and continues to suffer lost wages and benefits, has been humiliated and embarrassed and has had to accept a lower paying job. The plaintiff has requested reinstatement or a comparable job with the defendant but the defendant has refused to do so.
The second count repeats all the factual allegations of the first count and based on those allegations the plaintiff claims that her discharge was a violation of § 31-71(c) of the general statutes which bars withholding of wages by an employer except in three defined circumstances not applicable here.
 (a)
The court will first examine the allegations of the first count to see if they set forth a viable public policy exception to the termination at will doctrine. Generally speaking contracts of permanent employment or for an indefinite term are terminable at will, Somers v. Cooley Chevrolet Co., 146 Conn. 627, 629
(1959). Under such an employment arrangement an employer can terminate employment without a "just cause" reason.
Sheets v. Teddy's Frosted Foods Inc., 179 Conn. 471 (1980) created an exception to the employment at will rule. Sheets
CT Page 14647 described the task before it as "whether to recognize an exception to traditional rules governing employment at will so as to permit a cause of action for wrongful discharge where the discharge contravenes a clear mandate of public policy," id page 474. Sheets reviewed the law in other states and said the defendant could not "seriously contest the propriety of cases in other jurisdictions" which allowed wrongful discharge claims where an employee was fired because he or she refused to commit perjury, filed a worker's compensation claim or engaged in union activity. The court noted that such cases "are supported by mandates of public policy derived directly from the applicable state statutes and constitutions," id p. 476.
In Sheets itself the plaintiff said he was fired because he called to his boss's attention repeated violations of the state Uniform Food, Drug and Cosmetics Act; the court noted the plaintiff's position and said that if he had permitted such violations to occur it would have exposed the plaintiff to the possibility of criminal prosecution under the act, id p. 478. In fact in its actual holding the court did not rule that discharge for refusal to go along with violation of a state statute, without more, would constitute a grounds for a wrongful termination action. At page 480 it said: "For today it is enough to decide that an employee should not be put to an election whether to risk criminal sanction or to jeopardize . . . continued employment." In Faulkner v. United Technology, 240 Conn. 576
(1997) the court, in extending Sheets to cover discharge for refusal to ensure compliance with federal statutes also made a point of saying that the plaintiff employee's failure to ensure such compliance would have exposed him to criminal sanctions, id p. 585.
But our court has not limited the public policy exception ofSheets to situations where a discharged worker had to risk complying with an employer's order or exposing him or herself to incarceration for violation of a state or federal statute. The holdings and dicta in several case indicate this. As noted,Sheets itself also cited cases in other jurisdictions with approval where wrongful termination actions were found viable when a worker was fired for filing a worker compensation claim or engaging in union activity — none of these activities, although statutorily protected, put the worker in a dilemma of facing incarceration if he or she did not exercise certain rights pursuant to the statutory mandate. In these cases the court seemed to be saying that the discharge of a worker for the CT Page 14648 exercise of rights granted by statute or for attempting to take advantage of ameliorative work related legislation would also permit a wrongful termination action. To hold otherwise would subvert the legislative intention to give the worker the very rights and protections, exercise of which led to his or her discharge. The recent case of Parsons v. United Technology,243 Conn. 66, 80 (1997) supports this reading of Sheets, the court there cited a statutory scheme guaranteeing a safe workplace and said a wrongful termination action would lie if the employee is discharged for refusing to work under conditions imposing a substantial risk of death, disease or serious physical injury not contemplated by the employee's duties. The dilemma of obeying the boss or facing incarceration for violation of statutes was not a factor.
The Sheets' court also said that it was not deciding whether discharge for reasons other than violation of a state statute might also permit a wrongful termination claim.
 "We need not decide whether violation of a state statute is invariably a prerequisite to the conclusion that a challenged discharge violates public policy. Certainly when there is a relevant state statute we should not ignore the statement of public policy that it represents." id p. 481.
In fact one of the cases cited by the Sheets' court as "useful to compare" with the one before it was Pierce v. OrthoPharmaceutical Corp. 399 A.2d 1023 (NJ, 1979) which held that the plaintiff doctor was entitled to a trial to determine whether she had been wrongfully discharged for failing to perform certain clinical testing — the court noted that the plaintiff's status as a physician entitled her to invoke certain statutory provisions governing the licensing and conduct of physicians but she was also "entitled to invoke the Hippocratic Oath,"179 Conn. at p. 479.
In Morris v. Hartford Courant Co., 200 Conn. 676, 680 (1986) the court suggested that a plaintiff bringing a wrongful termination action must "identify the particular public policy affronted by (the employee's) termination." The court noted that the plaintiff had not alluded to any explicit statutory or constitutional provision violated by his firing nor did he claim his discharge "contravened any judicially conceived notion of CT Page 14649 public policy." The court said for Sheets analysis purposes a false but negligently made accusation of criminal conduct is not a demonstrably improper reason for dismissal and is not derived from some "important violation of public policy" (quoting language from Sheets). The court said it need not decide whether recklessly or intentionally accusing someone of a crime would have established a "viable cause of action". All of this translates into or at least permits the possibility of a certain amount of trial court discretion in deciding whether certain employer action, not necessarily violative of any statute, could constitute an "important violation of public policy".
However the court may be reluctant to encourage the trial courts to create judicially conceived notions of public policy — that is, not statutorily based — which could be used to provide exceptions to the termination at will doctrine. In Parsons v. United Technology, supra the court held that there was a viable action for wrongful termination and in reversing the trial court's contrary conclusion on this point felt obliged to find that specific state statutes guaranteeing workplace safety, §§ 31-49 and 31-370, had application event to foreign work sites. Even in Faulkner v. UnitedTechnology, 240 Conn. 576 (1997) the court based its conclusion that a public policy wrongful termination action lied because of infringement on the operation of federal statutes by the employer's termination of the plaintiff.[1]
The prospect of dozens of superior court judges fashioning non-statute based judicially conceived notions of public policy exceptions to the termination at will doctrine where months might elapse before appellate review could be had, does not seem compatible with the requirements of predictability which are crucial in labor-management relations as in all areas of economic activity where companies and workers have to be able to make rational plans for their future activity.
Such judicial creativity should be reserved for the most extreme cases — for example, as noted the dicta in Morris v.Hartford Courant suggests but does not decide that a situation giving rise to a wrongful termination action might present itself where a worker was intentionally and falsely accused of a crime by his or her boss as a pretext for dismissal.
Here the plaintiff apparently asks the court to create some judicially conceived notion of a public policy violation that CT Page 14650 would permit a wrongful termination action but there is no clear articulation of the important public policy issue that is claimed to be the basis for a wrongful termination action. Paragraph 5 of the first count alleges the plaintiff was wrongfully discharged by the defendant ". . .in order to avoid paying her bonus and other fringe benefits, in violation of the public policy" of the state. The first paragraph merely states that when the plaintiff was offered the job the defendant agreed to pay her a salary, a bonus and to provide insurance, pension and profit-sharing retirement benefits.
A motion to strike like the old common law demurrer only admits "well pleaded" facts; it does not admit opinions or mere legal conclusions or conclusory statements, Elliot's Appeal,74 Conn. 586, 601 (1902), McAdam v. Sheldon, 153 Conn. 278, 282
(1985), Moore v. Bunk, 154 Conn. 644, 649 (1967).
On the basis of the broad allegations made here the court cannot find that a nonstatutory violation of public policy has been established of such seriousness that a wrongful termination action should be permitted. It is not even clear from the allegations that the "bonus" and "fringe benefits" referred to in paragraph 5 had already accrued under the terms of original offer to hire at the time of dismissal. The "fringe benefits" are not described and certainly the mere offering of some benefits to employees does not mean an employment relationship is no longer at will or that the loss of such benefits, even a bonus, can be considered a violation of public policy. The reductio ad absurdum of such a position would mean that whenever an employer offers a worker a job for an indefinite term at a set weekly rate of pay — a classic at will situation — the employee when discharged could claim a dismissal in violation of public policy because he or she lost the right to earn future wages.
Here the letter attached to the complaint which offered the job to the plaintiff merely states that there would be a fixed bi-weekly starting salary and "full bonus potential will be 20% of annual salary and could reach 30% if full bonus objectives are exceeded." A series of "fringe benefits" are then referred to as being an entitlement of the job. Courts should tread very delicately in this area — under the guise of ruling in favor of an individual plaintiff to give what is conceived to be a fair result, workers in general could be harmed if the court's views were to be adopted. In other words, if the loss of discretionary bonuses or even year end bonuses and certain types of fringe CT Page 14651 benefits provide the basis for making a claim that some judicially created notion of public policy has been violated, thereby permitting a wrongful termination action, employers might be reluctant to offer such packages to at will employees — employees who probably are the most vulnerable in the labor market, non-unionized and/or unable to acquire anything more than at will employment. These are the type of issues that must be addressed before any judicially conceived public policy exceptions to termination at will are created.
Furthermore even aside from the foregoing considerations our state already has a statutory scheme in place providing remedies for workers who have had their "wages" improperly withheld, see § 31-71(e) and broad definition of "wages" in § 31-71(a)(3) of the general statutes.
Where the legislature has already provided remedial relief as to certain types of claims common law courts should not develop judicially conceived public policy exceptions to at will termination randomly going beyond the relief provided by statute. If there is a statutory remedy already provided it cannot be said "that permitting the discharge to go unredressed would leave a valuable social policy . . . unvindicated", Wehr v. Burroughs Corp. ,438 F. Sup. 1052, 1054 (E.D. Pa., 1977), cited at Atkins v.Bridgeport Hydraulic Co., 5 Conn. App. 643, 648 (1985). 1 0 Furthermore judicial intervention in such a situation could lead to confusion and contradictory bases on which relief could be sought especially if comprehensive state statutes cover an area of employer-labor relations.
For example, turning to the claims made here, if a judicially created public policy exception were created to at will termination because of claims of unpaid bonuses and fringe benefits that have not yet accrued would this in effect create a definition of "wages" conflicting with that definition provided in our statute, § 31-71(a)(3).
For all these reasons the motion to strike the first count is granted.
 (b)
The second count incorporating the first seven paragraphs of the first count alleges the plaintiff's "discharge is a violation of Sec. 31-71(e) of the Connecticut General Statutes," par. 8. CT Page 14652 The allegations on which this claim is based in this our fact pleading state are that in May 1995 the defendant was offered a managerial position and "agreed to pay the plaintiff a salary and bonus, and to provide insurance, pension and profit sharing retirement benefits," par. 1. Paragraph 5 alleges the "defendant unlawfully and wrongfully discharged plaintiff in order to avoid paying her bonus and other fringe benefits, in violation of the public policy of the State of Connecticut."
The problem the court has with these allegations is that as noted in the prior discussion there is no indication by way of factual allegation that, at the time of termination, the bonus and fringe benefits referred to had already vested under theterms of the employment offer when made.
The plaintiff cites several cases that apparently support the proposition that a Sheets public policy argument for wrongful discharge based on a § 31-72 claim for "unpaid wages" could be made even though the employee was terminated before such "wages" had vested or accrued — that is the claim being that the discharge was carried out to prevent the vesting of such rights,Cook v. Alexander Alexander of Conn. Inc., 40 Conn. Sup 246,248 (1985), Linkovich v. Heublin Inc., 7 SCR362 (1992), Okon v.Medical Marketing Group Inc., et al, 12 Conn. L. Rptr 228, 229 (1994). But there can be no claim for unpaid wages under § 31-72 or assertion that wages have been withheld under § 31-71(e) unless the definition of "wages" in § 31-71(a)(3) is met and "wages" is there defined as "compensation for labor or services rendered by an employee whether the amount is determined on a time, task, piece, commission or other basis of calculation". (emphasis added). "Rendered" is a past tense word; it implies a claim against the employer has already vested. Interestingly in Okon v. Medical Marketing Group Inc., supra, the court noted that the plaintiff sought to rebut the defendant employer's-argument that the wage protection statutes themselves provide a remedy precluding a wrongful discharge action by stating "the defendant's actions in terminating him in bad faith before his options vested preclude his claim under 31-72; thus he is left with this wrongful termination claim," id p 228. The court then goes on to agree with Cook v. Alexander Alexander ofConn. Inc., supra, however, and concludes by saying that "a complaint alleging that plaintiff's employment was terminated in order to prevent the vesting of certain rights to compensation which, if vested, would be enforceable rights under Connecticut's wage protection statutes states a cause of action for wrongful CT Page 14653 termination." But if there can be no claim under our wage protection statutes how can a public policy argument be based on those statutes. If there can be no such claim because the purported "wage" claim has not vested then how can such a claim be held to be violative of public policy without destroying the viability of the doctrine permitting termination at will. As previously observed every termination in an at will employment situation means that future benefits or "wages" by definition will not be paid to the discharged worker.[2]
The allegations made in paragraph 5 of the Second Count claiming the discharge was done to avoid payment of bonuses and fringe benefits all in violation of a state statute appears to be conclusory, merely state opinion and do not adequately present or define the issues in dispute. The court will strike the second count based on the motion to strike and also pursuant to the authority granted the court under P.B. § 10-1 which states as to all pleadings and complaints: "If any such pleading does not fully disclose the ground of claim or defense, the judicial authority may order a fuller and more particular statement, and, if in the opinion of the judicial authority the pleadings do not sufficiently define the issues in dispute, it may direct the parties to prepare other issues, and such issues shall, if the parties differ, be settled by the judicial authority."[3]
 (c)
In the third count the plaintiff claims that she was unlawfully discharged because of her gender in violation of public policy, see § 46a-60(1) of the general statutes. The defendant has also moved to strike this count.
The plaintiff characterizes the defendant's position as being based on a failure to exhaust administrative remedies argument. In other words §§ 46a-58 et seq., our Fair Employment Practices Act (FEPA), provides that the Commission on Human Rights and Opportunities (CHRO) can provide certain relief to an individual who files a complaint and proves her allegations that she has been terminated due to gender bias. The plaintiff concedes that she did not make any such complaint to the CHRO but argues that this should not deprive the court of subject matter jurisdiction, cf Concerned Citizens of Sterling v. Sterling,204 Conn. 551, 556 (19987), Simko v. Ervin, 234 Conn. 498, 503 (1995)
Our Court has "grudgingly" carved out several exceptions to CT Page 14654 the exhaustion requirement — a party does not have to exhaust administrative remedies when such a remedy would be "futile" or "inadequate".
It is clear, says the plaintiff, that under FEPA the CHRO cannot award attorney's fees or compensatory damages such as for emotional distress, see § 46a-86 and holding of court inBridgeport Hospital v. Commission on Human Rights Opportunities, 232 Conn. 91 (1995). Here these very damages are being sought by way of civil suit, the FEPA remedy is by definition inadequate and several courts have so held, Griswoldv. Blackburn Janitorial L.L.C., 1996 WL 497432, Gross v. Nearine,1995 WL 91411, Stevens v. E.R. Champion Sons, 1994 WL 240406,Richter v. Hoffman, 6 CSCR 641 (1991).
In the court's opinion the defendant's argument for striking this third count at least in the first instance does not implicate the doctrine of failure to exhaust administrative remedies but makes a broader claim.
Relying on Bridgeport Hospital v. CHRO, supra, what the defendant really appears to argue is that in light of the fact that the statutory scheme does not allow the CHRO to award attorney's fees and emotional distress damages no common law action can be brought for them. In a letter directed to the court as part of its final submission the defendant sums up its argument as follows:
 "Plaintiff seeks to gain common law tort damages which are unavailable under the gender discrimination statute by alleging wrongful termination. However, she should not be permitted to circumvent the legislature's carefully crafted scheme to handle gender discrimination lawsuits or to circumvent the limited public policy exception to the employment at will rule."
In fact the federal district courts interpreting the ambit of FEPA have held that the administrative procedure under FEPA with its provision for appellate review "is the sole remedy" for a violation of the act, Town of West Hartford v. Operation Rescue,726 F. Sup. 371, 380 (D. Conn., 1989), Billings v. Stone WebsterEngineering Corp. , 678 F. Sup. 984, 985 (D. Conn., 1988),Napolean v. Xerox Corp. , 656 F. Sup. 1120, 1125 (D. Conn., 1987). CT Page 14655 The federal cases cite certain language in Atkins v.Bridgeport Hydraulic Co., 5 Conn. App. 643 (1985); Powell v.Feroletto Steel Co., 659 F. Sup. 303, 304-305 (D. Conn. 1986) points our that FEPA is a comprehensive, remedial statute with a detailed enforcement scheme.
Although the Richter v. Hoffman, supra, line of cases use the rubric of inadequacy of remedies to excuse exhaustion of administrative remedies as a reason to bar a suit for wrongful termination under § 46a-60, the predicate upon which they are based is that although FEPA does not provide that the administrative agency can provide certain types of relief, litigants can rely on the policy behind the act to secure those damages the CHRO cannot give. Section 874A of Restatement (Second) Torts seems to be implicated. That section says:
 § 874A. Tort Liability for Violation of Legislative Provision
 When a legislative provision protects a class of persons by proscribing or requiring certain conduct but does not provide a civil remedy for the violation, the court may, if it determines that the remedy is appropriate in furtherance of the purpose of the legislation and needed to assure the effectiveness of the provision, accord to an injured member of the class a right of action, using suitable existing tort action or a new cause of action analogous to an existing tort action.
Bridgeport Hospital v. CHRO, supra, only says that the agency cannot award certain types of damages and is limited to the authorized to grant? In fact the language of Osborn v. RocklenAutomotive Parts Service, 4 Conn. App. 423 (1985) and Atkins v.Bridgeport Hydraulic Co., 5 Conn. App. 643 (1985) merely confirms this view of the statutory scheme. In Osborn the plaintiff instituted an action against his former employer for improperly discharging him in violation of § 46a-60(a)(1). Osborn andAtkins unlike the federal district court cases previously referred to do not say that the only remedy is an administrative one, they say that the administrative agency has "initial" responsibility for investigation and adjudication of employment discrimination claims and that the complaint in Osborn had to be CT Page 14656 dismissed not on the grounds that no remedy lied in the courtsbut that the plaintiff did not exhaust the administrative remedies he had.
But, the court does not have to resolve the issue of whether after Bridgeport Hospital v. Hydraulic, supra, an action for wrongful termination under § 46a-60 can be brought for damages not contemplated by FEPA.
The point really is that even if such an action is permissible, must a plaintiff exhaust his or her administrative remedies before bringing it? The answer to that would appear to be yes and it is in that sense that this court disagrees with theRichter v. Hoffman line of cases. Atkins and Osborn appear to dictate such a result and the comprehensive remedial nature of the act would seem to make it desirable. Section 46a-103 requires that where a complaint is in fact brought to the CHRO and a release is granted pursuant to § 46a-100 to bring a civil action a copy of the complaint must be served on the commissioner who shall have a right to intervene in such action. This underlines the concern the commission has with all discriminatory practices and patterns of discrimination. The commission is given broad remedial powers under the act; under § 46a-86 the commission can order the reinstatement of any dismissed employee with provision for back pay — this may obviate the need or desire of the discriminated against employee to pursue a civil remedy which could take years to wind its way through the courts. Furthermore, if a hearing is held under § 46a-86 on an individual's complaint under subsection (a) the CHRO can issue orders "requiring the respondent to cease and desist from the discriminatory practice and further requiring the respondent (employer) to take such affirmative action" as the CHRO presiding hearing officer concludes "will effectuate the purpose of this chapter." This seems to recognize a remedial power going beyond the provision of the remedies provided the individual complainant in subsection (b).
The state has an important interest in encouraging people with grievances under the act to initially file a complaint with the commission, the act provides comprehensive remedial powers to the CHRO and there is even a mechanism allowing the commission to authorize a civil action by way of a release. The court concludes the plaintiff failed to exhaust her administrative remedies therefore in light of Concerned Citizens of Sterling v. Sterling,supra, it concludes that it has no subject matter jurisdiction CT Page 14657 over the claim made under § 46a-60; that claim must therefore be dismissed.
 (d)
The defendant also seeks to have the fourth count stricken on the basis that it is legally insufficient. A request to revise would have been advisable here since this count appears to set forth two separate theories of recovery — that a written contract of employment was entered into between the parties which was breached by the termination and that implicit in such employment contract was an implied covenant of good faith and fair dealing which was violated by the termination.
 (1)
As to the claim of an express contract the fourth count makes the following allegation that may be considered relevant to, that theory of action.: in May 1995 the defendant offered the plaintiff a managerial position and agreed to pay her a salary and bonus and to provide insurance, pension and profit sharing retirement benefits (par. 1), the plaintiff accepted that offer and began working for the defendant in June, faithfully performing all her duties (par. 2 and 3) in October 1996 the defendant wrongfully and in bad faith discharged the plaintiff and did so in order to avoid paying her bonus and other fringe benefits (par. 4 and 5), a written contract of employment was in fact created which is attached to the complaint as Exhibit A (par. 15). The alleged written contract in fact offers the plaintiff a managerial position with the starting date to be determined by mutual agreement. This letter to the plaintiff hiring her then sets forth the amount of the bi-weekly salary and states the full bonus potential. It refers to a company relocation package and a variety of fringe benefits the plaintiff would be entitled to receive. The offer is dependent on the plaintiff completing a drug and physical screening. The letter concludes by saying that the corporate official who sent it looks forward to her employment.
The plaintiff contends the question of whether there is a contract is one for the jury. This may be generally true. But if there is specific or definitive language in a document that purports to be a contract the cases indicate that whether there was a contract and its scope are questions of law, Skolnick Sons v. Heyman, 7 Conn. App. 175, 178 (1986), Finley v. Aetna LifeCT Page 14658 Casualty Co., 202 Conn. 190, 199 (1987). Furthermore this issue and the words of this purported express contract must be examined in the context of the employment at will doctrine. Our state recognizes the employment at will doctrine — the "at-will relationship is characterized by the absence of any employment contract and lack of a definite term of employment. As noted, the general rule in Connecticut is that an employer may discharge an at-will employee at any time and that the employee may quit at any time," Labor Employment in Connecticut, Hirsch, Chapter 13, § 13-6, Carbone v. Atlantic Richfield Co, 204 Conn. 460
(1987). Under this doctrine, for example, the general rule is that "an annual salary term in a contract does not create a contract for a definite duration", Henkel v. Educational ResearchCouncil of America, 344 N.E.2d 118, 119 (Oh, 1976).
 "The modern rule is that in the absence of facts and circumstances which indicate that the agreement is for a specific term, an employment contract which provides for an annual rate of compensation, but makes no provision for the duration of employment, is not a contract for one year, but is terminable at will be either party."
The Henkel court went on to say:
 "It is our conclusion having reviewed all the evidence in this record that the employment agreement between the appellee (employee) and the Research Council (employer) did not specify a period of time, but rather a rate of salary, and as such was terminable at will by either party", id.
Also see Sullivan v. Heritage Foundation, 398 A.2d 856, 860 (Ca., 1979), In re Tyson, 487 N.Y.S. 2d 206, 208 (1985), Freeman v.Hardee's Food System. Inc., 165 S.E.2d 39, 41-42 (N.C., 1989),Paris v. N.E. Savings, 11 CLR 575, 577 (1994).
There is nothing alleged in the fourth count or in the letter offering the plaintiff her job that takes this case our of the employee at-will doctrine. There is no offer of a definite term of employment; the letter merely states the terms of compensation and bonuses and fringe benefits that may be earned during the course of employment. Even if somehow the positive language of CT Page 14659 the letter is viewed as an offer of permanent employment the rule in Connecticut is that "an agreement for a permanent employment is no more than an indefinite general hiring, terminable at the will of either party without liability to the other", Fisher v.Jackson, 142 Conn. 734, 736 (1955), Sheets v. Teddy's FrostedFoods Inc., 179 Conn. 471, 474 (1980).
Thus, giving the allegations here their most favorable reading, we have a general contract of employment for an indefinite term. None of the terms of the alleged express contact are such as would bar the termination of the plaintiff at-will and without just cause.
 (2)
The fourth count appears to make the further allegation that "implied in said employment contract" just discussed was a covenant that the defendant would act in good faith and not fire her without just cause (par. 16); by firing the plaintiff the defendant "breached its implied covenant of good faith with respect to performance and enforcement of said contract."
It would be incongruous to hold that although a breach of the alleged express contract does not give rise to an exception to the employment at-will doctrine due to the terms of such an agreement to hire, such an exception can be found by breach of any implied covenants of good faith and fair dealing hidden in the nooks and crannies of the very same agreement.
For this very reason perhaps the appellate courts have said:
 ". . . although we endorse the applicability of the good faith and fair dealing principle to employment contracts, its essence is the fulfillment of the reasonable expectations of the parties. Where employment is clearly terminable at will, a party cannot ordinarily be deemed to lack good faith in exercising this contractual right", Magnan v. Ananconda Industries Inc, 193 Conn. 558, 572 (1984)
Building upon and adopting this position the court in Carbonev. Atlantic Richfield Inc., 204 Conn. 460, 470-471 (1987) went on to say:
CT Page 14660
"Thus, absent a showing that the discharge involves an impropriety which intervenes some important public policy, an employee may not challenge a dismissal based upon an implied covenant of good faith and fair dealing."
In the employment contract area then the doctrine of the implied covenant of good faith and fair dealing seems to be limited to a Sheets public policy claim. It is therefore perhaps redundant to other public policy claims made in the complaint and in any event cannot be used for bootstrap purposes to find that a contract alleged which does not by its terms bar termination at will somehow supports an argument that its "implied" terms should lead to such a result.
The fourth count is stricken.
 (e)
The fifth count repeats the factual allegations repeated in the just concluded discussion; and claims that "as a result of the actions of the parties, and oral contract of employment was created."[4]
Apparently this is an alternative theory of recovery to any claim of an express contract in the fourth count. The defendant attacks the legal sufficiency of this count. In response the plaintiff refers to Torosyan v. Bochringer IngelhamPharmaceuticals Inc., 234 Conn. 1 (1995) and its language at page 13 to the effect that "all employer-employee relationships not governed by express contracts involve some type of implied `contract' of employment." the court then goes on to say: "To determine the contents of any particular implied contract of employment the factual circumstances of the parties' relationship must be examined in the light of legal rules governing unilateral contracts". At page 14 the court notes that "Typically, an implied contract of employment does not limit the terminability of an employee's employment but merely includes terms specifying wages, working hours, job responsibilities, and the like. Thus, as a general rule, contracts of permanent employment, or for an indefinite term, are terminable at will."
The court in Torosyan went on to hold, that the trial court's finding that there was an implied contract providing that the employment of the plaintiff could be terminated only for cause CT Page 14661 was not clearly erroneous because of certain provisions in an employment manual given the plaintiff and oral representations made to him.
Here there are no factual allegations in the complaint that establish the nature of the implied contract or its terms that would in any way allow it to be used as a basis to claim that it precluded the termination at will of the plaintiff. We are a fact pleading state and the facts on which a legal theory is based must be set forth. This is not even a situation where the allegations are conclusory. The point is that merely because an implied contract of employment of some kind existed does not have any bearing, standing alone, on whether an employee can be terminated at will under the terms of that implied contract.
The fifth count is stricken.
 (f)
In the sixth count the plaintiff alleges that prior to accepting employment with the defendant she was employed and living in Chicago. (Par. 6) Included in the offer of hire to the plaintiff was a relocation package to cover moving expenses, costs of the sale of her Chicago home and other relocation expenses. (Par. 7) Paragraph 8 states that at the time of her termination the defendant had not fulfilled its obligations. The defendant moves to strike this count insofar as it is based on breach of contract theory — the necessary elements of such a theory are not set forth.
But the court is obligated to give the complaint that reading which is most favorable in opposition to a motion to strike and there seems to be sufficient allegation of a promissory estoppel theory.
 ". . . under a promissory estoppel theory a party may maintain a claim for damages based upon a promise which induces the party's action or forebearance, if such action or forebearance is undertaken in reasonable reliance upon the promise," Finley v. Aetna Life Casualty Co., 202 Conn. 190, 205
(1987).
The count alleges the plaintiff accepted the offer of CT Page 14662 employment which included the "relocation package" and it can be reasonably inferred that part of the reason she did so was because of the offer made to her including the agreement to pay relocation expenses.
The motion to strike the sixth count is denied.
 (g)
In light of the court's rulings on several of the previous counts striking the wrongful termination claim, the claim for punitive damages must also be stricken from the claim for relief.
 . . . .
The first through fifth counts are stricken, the court does not strike the sixth count.
CORRADINO, J.