EMARD H. SHEETS *v.* TEDDY'S FROSTED FOODS, INC.

COTTER, C. J., LOISELLE, BOGDANSKI, PETERS and HEALEY, Js.

Argued October 9, 1979—decision released January 22, 1980

*Robert F. McWeeny,* for the appellant (plaintiff).
*Neil P. Coughlan,* for the appellee (defendant).

PETERS, J.  The issue in this case is whether an employer has a completely unlimited right to terminate the services of an employee whom it has hired for an indefinite term.  The plaintiff, Emard H. Sheets, filed a complaint that as amended alleged that he had been wrongfully discharged from his employment as quality control director and operations manager of the defendant, Teddy's Frosted Foods, Inc.  The defendant responded with a motion to strike the complaint as legally insufficient.  The plaintiff declined to plead further when that motion was granted.  From the consequent rendering of judgment for the defendant, the plaintiff has appealed to this court.

Since this appeal is before us pursuant to a motion to strike,[1] we must take the facts to be those alleged in the plaintiff's complaint as amended, and must construe the complaint in the manner most favorable to the pleader.  *Stradmore Development Corporation* v. *Commissioners,* 164 Conn. 548, 550–51, 324 A.2d 919 (1973); *Senior* v. *Hope,* 156 Conn. 92, 97, 239 A.2d 486 (1968); *Rossignol* v. *Danbury School of Aeronautics, Inc.,* 154 Conn. 549, 557, 227 A.2d 418 (1967).  The complaint alleges that for a four-year period, from November, 1973, to November, 1977, the plaintiff was employed

---

[1] The motion to strike, Practice Book, 1978, § 151, is the modern equivalent of the former demurrer.

by the defendant, a producer of frozen food products, as its quality control director and subsequently also as operations manager. In the course of his employment, the plaintiff received periodic raises and bonuses. In his capacity as quality control director and operations manager, the plaintiff began to notice deviations from the specifications contained in the defendant's standards and labels, in that some vegetables were substandard and some meat components underweight. These deviations meant that the defendant's products violated the express representations contained in the defendant's labeling; false or misleading labels in turn violate the provisions of General Statutes § 19-222,[2] the Connecticut Uniform Food, Drug and Cosmetic Act. In May of 1977, the plaintiff communicated in writing to the defendant concerning the use of substandard raw materials and underweight components in the defendant's finished products. His recommendations for more selective purchasing and conforming components were ignored. On November 3, 1977, his employment with the defendant was terminated. Although the stated reason for his discharge was unsatisfactory performance of his duties, he was actually dismissed in retaliation for his efforts to ensure that the defendant's products would comply with the applicable law relating to labeling and licensing.

The plaintiff's complaint alleges that his dismissal by his employer was wrongful in three respects. He claims that there was a violation of an implied contract of employment, a violation of

---

[2] Section 19-222 provides in relevant part: "MISBRANDED FOOD. A food shall be deemed to be misbranded: (a) If its labeling is false or misleading in any particular."

public policy, and a malicious discharge. On this appeal, the claim of malice has not been separately pursued, and we are asked to consider only whether he has stated a cause of action for breach of contract or for intentionally tortious conduct. On oral argument, it was the tort claim that was most vigorously pressed, and it is upon the basis of tort that we have concluded that the motion to strike was granted in error.

The issue before us is whether to recognize an exception to the traditional rules governing employment at will so as to permit a cause of action for wrongful discharge where the discharge contravenes a clear mandate of public policy. In addressing that claim, we must clarify what is not at stake in this litigation. The plaintiff does not challenge the general proposition that contracts of permanent employment, or for an indefinite term, are terminable at will. See *Somers* v. *Cooley Chevrolet Co.,* 146 Conn. 627, 629, 153 A.2d 426 (1959); *Fisher* v. *Jackson,* 142 Conn. 734, 736, 118 A.2d 316 (1955). Nor does he argue that contracts terminable at will permit termination only upon a showing of just cause for dismissal. Some statutes, such as the Connecticut Franchise Act, General Statutes § 42-133e through 42-133h, do impose limitations of just cause upon the power to terminate some contracts; see § 42-133f; but the legislature has recently refused to interpolate such a requirement into contracts of employment. See H.B. No. 5179, 1974 Sess.[3]  There is a significant distinction

---

[3] Some statutes of course expressly forbid retaliatory discharge. See, e.g., Public Acts 1979, No. 79-599, and 29 U.S.C. § 660 (c) (1) (1976), which is discussed in *Marshall* v. *Whirlpool Corporation,* 593 F.2d 715 (6th Cir. 1979), cert. granted, 444 U.S. 1009, 100 S. Ct. 43, 62 L. Ed. 2d 29 (1979) (on other grounds).

between a criterion of just cause and what the plaintiff is seeking. "Just cause" substantially limits employer discretion to terminate, by requiring the employer, in all instances, to proffer a proper reason for dismissal, by forbidding the employer to act arbitrarily or capriciously. See *Pierce* v. *Ortho Pharmaceutical Corporation*, 166 N.J. Super. 335, 341, 399 A.2d 1023 (1979). By contrast, the plaintiff asks only that the employer be responsible in damages if the former employee can prove a demonstrably *improper* reason for dismissal, a reason whose impropriety is derived from some important violation of public policy.

The argument that contract rights which are inherently legitimate may yet give rise to liability in tort if they are exercised improperly is not a novel one. Although private persons have the right not to enter into contracts, failure to contract under circumstances in which others are seriously misled gives rise to a variety of claims sounding in tort. See Kessler & Fine, "Culpa in Contrahendo," 77 Harv. L. Rev. 401 (1964). The development of liability in contract for action induced by reliance upon a promise, despite the absence of common-law consideration normally required to bind a promisor; see Restatement (Second), Contracts § 90 (1973); rests upon principles derived at least in part from the law of tort. See Gilmore, The Death of Contract 8-90 (1974). By way of analogy, we have long recognized abuse of process as a cause of action in tort whose gravamen is the misuse or misapplication of process, its use "in an improper manner or to accomplish a purpose for which it was not designed." *Varga* v. *Pareles*, 137 Conn. 663, 667, 81 A.2d 112 (1951); *Schaefer* v. *O.K. Tool Co.*, 110 Conn. 528, 532–33, 148 A. 330 (1930); Restatement

(Second), Torts § 682 (1977); Wright & Fitzgerald, Connecticut Law of Torts § 163 (1968); Prosser, Torts § 121 (1971).

It would be difficult to maintain that the right to discharge an employee hired at will is so fundamentally different from other contract rights that its exercise is never subject to judicial scrutiny regardless of how outrageous, how violative of public policy, the employer's conduct may be. Cf. General Statutes § 31-126 (unfair employment practices). The defendant does not seriously contest the propriety of cases in other jurisdictions that have found wrongful and actionable a discharge in retaliation for the exercise of an employee's right to: (1) refuse to commit perjury; *Petermann* v. *International Brotherhood of Teamsters,* 174 Cal. App. 2d 184, 189, 344 P.2d 25 (1959); (2) file a workmen's compensation claim; *Frampton* v. *Central Indiana Gas Co.,* 260 Ind. 249, 252, 297 N.E.2d 425 (1973); *Sventko* v. *Kroger Co.,* 69 Mich. App. 644, 648-49, 245 N.W.2d 151 (1976); *Brown* v. *Transcon Lines,* 284 Ore. 597, 603, 588 P.2d 1087 (1978); (3) engage in union activity; *Glenn* v. *Clearman's Golden Cock Inn, Inc.,* 192 Cal. App. 2d 793, 798, 13 Cal. Rptr. 769 (1961); (4) perform jury duty; *Nees* v. *Hocks,* 272 Ore. 210, 216-19, 536 P.2d 512 (1975); *Reuther* v. *Fowler & Williams, Inc.,* 255 Pa. Super. 28, 31-32, 386 A.2d 119 (1978). While it may be true that these cases are supported by mandates of public policy derived directly from the applicable state statutes and constitutions, it is equally true that they serve at a minimum to establish the principle that public policy imposes some limits on unbridled discretion to terminate the employment of someone hired at will. See Blades, "Employment at Will vs. Individual Free-

dom: On Limiting the Abusive Exercise of Employer Power," 67 Colum. L. Rev. 1404 (1967); Blumberg, "Corporate Responsibility and the Employee's Duty of Loyalty and Obedience: A Preliminary Inquiry," 24 Okla. L. Rev. 279, 307–318 (1971). No case has been called to our attention in which, despite egregiously outrageous circumstances, the employer's contract rights have been permitted to override competing claims of public policy, although there are numerous cases in which the facts were found not to support the employee's claim. See *Larsen* v. *Motor Supply Co.*, 117 Ariz. 507, 508, 573 P.2d 907 (1978); *Scroghan* v. *Kraftco Corporation*, 551 S.W.2d 811, 812 (Ky. 1977); *Jackson* v. *Minidoka Irrigation District*, 98 Idaho 330, 333–34, 563 P.2d 54 (1977); *Geary* v. *United States Steel Corporation*, 456 Pa. 171, 183, 319 A.2d 174 (1974); *Roberts* v. *Atlantic Richfield Co.*, 88 Wash. 2d 887, 896, 568 P.2d 764 (1977); but cf. *Hinrichs* v. *Tranquilaire Hospital*, 352 So. 2d 1130, 1131 (Ala. 1977).

The issue then becomes the familiar common-law problem of deciding where and how to draw the line between claims that genuinely involve the mandates of public policy and are actionable, and ordinary disputes between employee and employer that are not. We are mindful that courts should not lightly intervene to impair the exercise of managerial discretion or to foment unwarranted litigation. We are, however, equally mindful that the myriad of employees without the bargaining power to command employment contracts for a definite term are entitled to a modicum of judicial protection when their conduct as good citizens is punished by their employers.

The central allegation of the plaintiff's complaint is that he was discharged because of his conduct in calling to his employer's attention repeated violations of the Connecticut Uniform Food, Drug and Cosmetic Act. This act prohibits the sale of mislabeled food. General Statutes §§ 19-213,[4] 19-222.[5] The act, in § 19-215,[6] imposes criminal penalties upon anyone who violates § 19-213; subsection (b) of § 19-215 makes it clear that criminal sanctions do not depend upon proof of intent to defraud or mislead, since special sanctions are imposed for intentional misconduct. The plaintiff's position as quality control director and operations manager might have exposed him to the possibility of criminal prosecution under this act. The act was intended to "safeguard the public health and promote the public welfare by protecting the consuming public from injury by product use and the purchasing public from injury by merchandising deceit . . . ." General Statutes § 19-211.

It is useful to compare the factual allegations of this complaint with those of other recent cases in which recovery was sought for retaliatory dis-

[4] "[General Statutes] Sec. 19-213. PROHIBITED ACTS. The following acts and the causing thereof shall be prohibited: (a) The sale in intrastate commerce of any food, drug, device or cosmetic that is adulterated or misbranded; (b) the adulteration or misbranding of any food, drug, device or cosmetic in intrastate commerce . . . ."

[5] Section 19-222 provides in relevant part: "MISBRANDED FOOD. A food shall be deemed to be misbranded: (a) If its labeling is false or misleading in any particular."

[6] Section 19-215 provides in relevant part: "PENALTIES. (a) Any person who violates any provision of section 19-213 shall, on conviction thereof, be imprisoned not more than six months or fined not more than five hundred dollars or both . . . . (b) Notwithstanding the provisions of subsection (a) of this section, any person who violates any provision of section 19-213, with intent to defraud or mislead, shall be imprisoned not more than one year or fined not more than one thousand dollars or both."

charge. In *Geary* v. *United States Steel Corporation,* supra, in which the plaintiff had disputed the safety of tubular steel casings, he was denied recovery because, as a company salesman, he had neither the expertise nor the corporate responsibility to "exercise independent, expert judgment in matters of product safety." Id., 181. By contrast, this plaintiff, unless his title is meaningless, did have responsibility for product quality control. Three other recent cases in which the plaintiff's claim survived demurrer closely approximate the claim before us. In *Trombetta* v. *Detroit, Toledo & Ironton R. Co.,* 81 Mich. App. 489, 496, 265 N.W.2d 385 (1978), a cause of action was stated when an employee alleged that he had been discharged in retaliation for his refusal to manipulate and alter sampling results for pollution control reports required by Michigan law. There, as here, falsified reports would have violated state law. In *Harless* v. *First National Bank in Fairmont,* 246 S.E.2d 270, 276 (W. Va. 1978), an employee stated a cause of action when he alleged that he had been discharged in retaliation for his efforts to ensure his employer's compliance with state and federal consumer credit protection laws. There, as here, the legislature had established a public policy of consumer protection. In *Pierce* v. *Ortho Pharmaceutical Corporation,* 166 N.J. Super. 335, 342, 399 A.2d 1023 (1979), the plaintiff was entitled to a trial to determine whether she had been wrongfully discharged for refusing to pursue clinical testing of a new drug containing a high level of saccharin; the court noted that the plaintiff's status as a physician entitled her to invoke the Hippocratic Oath as well as state statutory provisions governing the licensing and the conduct of physicians. There, as here, the case might have been dismissed as a conflict in judgment.

In the light of these recent cases, which evidence a growing judicial receptivity to the recognition of a tort claim for wrongful discharge, the trial court was in error in granting the defendant's motion to strike. The plaintiff alleged that he had been dismissed in retaliation for his insistence that the defendant comply with the requirements of a state statute, the Food, Drug and Cosmetic Act. We need not decide whether violation of a state statute is invariably a prerequisite to the conclusion that a challenged discharge violates public policy. Certainly when there is a relevant state statute we should not ignore the statement of public policy that it represents. For today, it is enough to decide that an employee should not be put to an election whether to risk criminal sanction or to jeopardize his continued employment.

There is error and the case is remanded for further proceedings.

In this opinion BOGDANSKI and HEALEY, Js., concurred.

COTTER, C. J. (dissenting). I cannot agree that, on the factual situation presented to us, we should abandon the well-established principle that an indefinite general hiring may be terminated at the will of either party without liability to the other. *Somers* v. *Cooley Chevrolet Co.,* 146 Conn. 627, 629, 153 A.2d 426; *Fisher* v. *Jackson,* 142 Conn. 734, 736, 118 A.2d 316; *Carter* v. *Bartek,* 142 Conn. 448, 450, 114 A.2d 923; *Boucher* v. *Godfrey,* 119 Conn. 622, 627, 178 A. 655. The majority by seeking to extend a "modicum" of judicial protection to shield employees from retaliatory discharges instead offers them a sword with which to coerce employers

to retain them in their employ. In recognizing an exception to the traditional rules governing employment at will and basing a new cause of action for retaliatory discharge on the facts of this case, the majority is necessarily led to the creation of an overly broad new cause of action whose nuisance value alone may impair employers' ability to hire and retain employees who are best suited to their requirements. Other jurisdictions which have recognized a cause of action for retaliatory discharge have done so on the basis of a much clearer and more direct contravention of a mandate of public policy.

The majority seeks to minimize the fact that in *Petermann* v. *International Brotherhood of Teamsters,* 174 Cal. App. 2d 184, 344 P.2d 25 (refusing to commit perjury); *Frampton* v. *Central Indiana Gas Co.,* 260 Ind. 249, 297 N.E.2d 425 (filing workmen's compensation claim); *Sventko* v. *Kroger Co.,* 69 Mich. App. 644, 245 N.W.2d 151 (same); *Brown* v. *Transcon Lines,* 284 Ore. 597, 588 P.2d 1087 (same); *Glenn* v. *Clearman's Golden Cock Inn, Inc.,* 192 Cal. App. 2d 793, 13 Cal. Rptr. 769 (engaging in union activity); *Nees* v. *Hocks,* 272 Ore. 210, 536 P.2d 512 (performing jury duty); *Reuther* v. *Fowler & Williams, Inc.,* 255 Pa. Super. 28, 386 A.2d 119 (same); the retaliatory discharges directly contravened a clear statutory or constitutional mandate by viewing these cases as having a least common denominator of establishing "the principle that public policy imposes some limits on unbridled discretion to terminate the employment of someone hired at will." Nevertheless, the thrust of these cases is that a retaliatory discharge in the particular circumstances at issue would be within certain statutory prohibitions; *Frampton* v. *Central Indiana*

*Gas Co.,* supra, 252; defeat the purpose of the legislative scheme; *Sventko* v. *Kroger Co.,* supra, 648; or undermine the state's declared policy; *Petermann* v. *International Brotherhood of Teamsters,* supra, 189.

In contrast, the purposes of the statute the majority would rely on, the Connecticut Uniform Food, Drug and Cosmetic Act, General Statutes §§ 19-211 through 19-239, can only be considered as, at most, marginally affected by an allegedly retaliatory discharge of an employee who observed the supposed sale of shortweight frozen entrees and the use of U. S. Government Certified "Grade B" rather than "Grade A" vegetables. A retaliatory discharge in the present case would not necessarily thwart or inhibit the Connecticut Uniform Food, Drug and Cosmetic Act's purpose of protecting the consumer. The plaintiff, if he desired to protect the consumer, could have communicated, even anonymously, to the commissioner of consumer affairs his concerns that his employer was violating the Food, Drug and Cosmetic Act so as to invoke the statute's enforcement mechanisms. See General Statutes §§ 19-214 through 19-217. To further and comply with the public policy expressed in Connecticut's Uniform Food, Drug and Cosmetic Act and to avoid the exceedingly remote possibility of criminal sanctions,[1] the plaintiff need not have jeopardized his continued employment. There is no indication that the plaintiff has either, before or after his dis-

---

[1] There is no allegation in the plaintiff's amended complaint that he was exposed to criminal liability by the defendant's alleged violations and it should be noted that those presumed violations could well fall within the Uniform Food, Drug and Cosmetic Act's provision for minor violations which the commissioner of consumer protection is not required to report to the state's attorney for possible institution of criminal proceedings. General Statutes § 19-218.

charge, informed or even attempted to inform the commissioner of consumer protection of violations the plaintiff claims to have first noted in his fourth year as the defendant's quality control director and fourth month as its operations manager. Unlike those cases where an employer allegedly discharged employees for engaging in union activities or filing workmen's compensation claims and the discharge itself contravened a statutory mandate, in the present case the discharge itself at most only indirectly impinged on the statutory mandate.

Consequently, the majority seemingly invites the unrestricted use of an allegation of almost any statutory or even regulatory violation by an employer as the basis for a cause of action by a discharged employee hired for an indefinite term. By establishing a cause of action, grounded upon "intentionally tortious conduct," for retaliatory discharges which do not necessarily in and of themselves directly contravene statutory mandates, the majority is creating an open-ended arena for judicial policy making and the usurpation of legislative functions. To base this new cause of action on a decision as to whether an alleged reason for discharge "is derived from some important violation of public policy" is not to create adequate and carefully circumscribed standards for this new cause of action but is to invite the opening of a Pandora's box of unwarranted litigation arising from the hope that the judicial estimate of derivation, importance, and public policy matches that of the plaintiff.

Moreover, this is policy making that the Connecticut legislature recently declined to undertake. In 1974, the Connecticut General Assembly considered and rejected a bill which would have provided that "[a]ny employee [including private

sector employees] hired for an indefinite term, may be dismissed only for just cause or because of the employer's reduction in work force for business reasons." H.B. No. 5179, 1974 Sess. Representative Francis J. Mahoney, the bill's sponsor, gave examples of the kind of discharges he intended the bill to cover: discharges for overlooking violations of building codes or for campaigning for the wrong political party. 17 H.R. Proc., Pt. 5, 1974 Sess., pp. 2689, 2694–95.[2] Thus, "just cause" in the overwhelmingly rejected 1974 bill was meant to encompass the kinds of retaliatory discharge that the majority approves as a new cause of action. Furthermore, the most recent legislature enacted a statute protecting "whistle blowing" state employees; Public Acts 1979, No. 79-599; and in Public Acts 1979, No. 153, addressed the problem of retaliatory dismissals of building officials. The legislature is thus adopting appropriate remedies for certain types of retaliatory discharges at its own considered pace and there appears to be no urgency for this court to violate that measured momentum by creating a broadly based new cause of action. In these circumstances, this court should consider itself precluded from substituting its own ideas of what might be wise policy in place of a clear expression of legislative will. See *Penfield* v. *Jarvis,* 175 Conn. 463, 475, 399 A.2d 1280; *United Aircraft Corporation* v. *Fusari,* 163 Conn. 401, 415, 311 A.2d 65.

Finally, it should be reiterated that the minority of jurisdictions which have created a cause of action

---

[2] As the trial court points out in its memorandum of decision, the 1974 bill was just one of four bills introduced in recent years that the General Assembly has failed to pass which were aimed at providing a remedy for employees who claimed unjust discharges. The other three bills were No. 5151, 1975 Sess.; No. 5299, 1976 Sess.; No. 7568, 1977 Sess.

for retaliatory discharges have done so with caution and when the employee termination contravenes a clear mandate of public policy.[3] It is because the majority abandons that caution and for the reason that the factual situation before us does not demonstrate a "wrongful discharge where the discharge contravenes a clear mandate of public policy" that I feel compelled to dissent.

In this opinion LOISELLE, J., concurred.

---

[3] Even the examples the majority cites of recent cases from other jurisdictions which acknowledge a cause of action for retaliatory discharge are distinguishable from the present case and exhibit considerable circumspection. In *Pierce* v. *Ortho Pharmaceutical Corporation,* 166 N.J. Super. 335, 399 A.2d 1023, the court, upon declaring that there should be a trial to determine whether the plaintiff's alleged retaliatory discharge was in fact and in law wrongful, stated (p. 1026), inter alia: "[I]f there is to be such an exception to the at-will employment rule, it must be tightly circumscribed so as to apply only in cases involving truly significant matters of clear and well-defined public policy and substantial violations thereof. . . . [T]he adoption of any such new doctrine must be grounded in a specific factual and legal context resulting from a plenary hearing, at which the proofs and public policy considerations involved will be fully developed and taken into account in the final determination. As indicated, we express no views on this issue. The matter should be decided in the first instance by the trial court after a hearing."

In *Trombetta* v. *Detroit, Toledo & Ironton R. Co.,* 81 Mich. App. 489, 498, 265 N.W.2d 385, the court ruled that although a cause of action was stated because the defendant's actions clearly violated the law of the state, the trial court's granting of the defendants' motion for summary judgment was not error because the plaintiff failed to submit any admissible evidence at trial to contradict the sworn statements made by the defendants' agents. In *Harless* v. *First National Bank in Fairmont,* 246 S.E.2d 270 (W. Va.), the court was confronted with outrageous circumstances: initial firing, rehiring, demotion, harassment, destruction of incriminating files, collusion between bank officers and bank directors, false promises of confidentiality by bank officers and auditors, an acknowledgment of illegality by a bank director, and finally discharge. In *Harless,* the plaintiff informed outside regulatory authorities of his employer's violations and those violations of a statute were clearly substantial and intentional. Id., 275.