NICOLE ANN THIBODEAU v. DESIGN GROUP ONE
ARCHITECTS, LLC
(AC 20724)

Schaller, Flynn and Dupont, Js.

Argued April 4—officially released July 31, 2001

*Gary E. Phelan*, with whom, on the brief, was *Elaine Rubinson*, for the appellant (plaintiff).

*Michael D. O'Connell*, with whom were *Diane C. Mokriski* and on the brief, *Julia B. Morris*, for the appellee (defendant).

*Opinion*

DUPONT, J. The plaintiff, Nicole Ann Thibodeau, appeals from the summary judgment rendered in favor of the defendant, Design Group One Architects, LLC. On appeal, the plaintiff claims that the trial court improperly determined as a matter of law that the statutory scheme of the Fair Employment Practices Act (act), General Statutes § 46a-51 et seq., bars a cause of action for wrongful discharge based on pregnancy if an employer has fewer than three employees.[1] We hold that there is a public policy in Connecticut against sex discrimination in employment sufficiently expressed in statutory and constitutional law to allow a cause of action for discrimination based on pregnancy. Accordingly, we reverse the judgment of the trial court.

---

[1] A motion to strike for failure to state a cause of action could have resolved that question. See *Faulkner* v. *United Technologies Corp.*, 240 Conn. 576, 693 A.2d 293 (1997); *Sheets* v. *Teddy's Frosted Foods, Inc.*, 179 Conn. 471, 427 A.2d 385 (1980). The motion for summary judgment, and the affidavit and counteraffidavit filed in connection therewith, raised a question of fact that would have precluded summary judgment if the plaintiff had stated a cause of action.

The following facts and procedural history are necessary to our resolution of the plaintiff's appeal. In April, 1997, the defendant hired the plaintiff as a receptionist, secretary and bookkeeper. She was an at-will employee. At all times relevant, the defendant employed two individuals and had three principals. The act applies only to those employers with three or more employees. General Statutes § 46a-51 (10).

The plaintiff notified the defendant of her pregnancy in December, 1997. The defendant terminated the plaintiff's employment on or about April 28, 1998. The plaintiff filed a two count complaint on November 5, 1999, alleging wrongful termination of her employment in violation of public policy and a violation of the duty of good faith and fair dealing. The complaint alleged that the defendant had terminated the plaintiff "as a result of her doctor appointments," which reason contravened public policy. In its answer, the defendant alleged that the plaintiff's termination stemmed from her performance deficiencies. The defendant, alternatively, denied that the plaintiff could avail herself of Connecticut's public policy or federal public policy against pregnancy discrimination as embodied in General Statutes § 46a-60 (a) (7) and in 42 U.S.C. § 2000e (k), respectively.

On January 14, 2000, the defendant filed a motion for summary judgment, claiming that the public policy proffered by the plaintiff did not apply to the facts of the case and, therefore, that the defendant was entitled to judgment as a matter of law. On March 31, 2000, the court granted the defendant's motion and rendered judgment as a matter of law in favor of the defendant as to count one, which alleged wrongful discharge. Because the court determined that the defendant did not wrongfully discharge the plaintiff in violation of public policy, the second count, alleging a violation of the duty of good faith and fair dealing, necessarily failed.

See *Magnan* v. *Anaconda Industries, Inc.*, 193 Conn. 558, 479 A.2d 781 (1984).[2] Thus, the court rendered summary judgment as to both counts. This appeal followed.

We first set forth the applicable standard of review. Summary judgment is appropriate "if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Practice Book § 17-49. Where, as here, the court has rendered judgment as a matter of law, our review of that conclusion is plenary. *Trimel* v. *Lawrence & Memorial Hospital Rehabilitation Center*, 61 Conn. App. 353, 356, 764 A.2d 203, cert. granted on other grounds, 255 Conn. 948, 769 A.2d 64 (2001). As a reviewing court, we must therefore determine whether the trial court's legal conclusions are legally and logically correct, and find support in the record. Id. Mindful of those basic principles, we now consider the issue on appeal.

The plaintiff argues that although the number of employees that the defendant employs has precluded her from statutory redress, she nonetheless can maintain a cause of action for wrongful termination of employment in violation of public policy. The plaintiff argues that Connecticut has a public policy against pregnancy discrimination in employment irrespective of the number of employees. That public policy finds its derivations, according to the plaintiff, in both statutory and constitutional law.

The defendant agrees that a public policy against pregnancy discrimination in employment exists, but

---

[2] Our Supreme Court requires an at-will employee to challenge his or her dismissal on the basis of a public policy violation whether the plaintiff frames the claim in tort or in contract. Therefore, if the plaintiff's tort claim fails because there was no public policy violation, an alleged violation of the implied covenant of good faith and fair dealing similarly fails. See *Magnan* v. *Anaconda Industries, Inc.*, supra, 193 Conn. 558.

counters that such policy does not extend to every employee in the state. The defendant maintains that the court correctly held that the relevant provisions of the act articulate a more limited public policy against such job discrimination, restricting the breadth of the policy to employers with three or more employees. The defendant also argues, as the court stated in its memorandum of decision, that the constitution of Connecticut cannot provide the basis for any public policy against pregnancy discrimination in this case because no state action was involved. We disagree with the characterization by the court and by the defendant of Connecticut's public policy.

In its memorandum of decision, the court recognized the existence of a factual dispute concerning the plaintiff's termination. The plaintiff asserted that her pregnancy precipitated her discharge, whereas the defendant insisted that it was her poor job performance. The court held, however, that even if the plaintiff's allegation accurately identified the reason for her termination, an at-will employee has no cause of action for wrongful discharge when an employer of fewer than three persons fires her on the ground of pregnancy. Our examination and consideration of existing case law lead us to a different conclusion.

In Connecticut, an employer and employee have an at-will employment relationship in the absence of a contract to the contrary. Employment at will grants both parties the right to terminate the relationship for any reason, or no reason, at any time without fear of legal liability. Beginning in the late 1950s, however, courts began to carve out certain exceptions to the at-will employment doctrine, thereby giving rise to tort claims for wrongful discharge. Certain employer practices provoked public disfavor, and unlimited employer discretion to fire employees eventually yielded to a more limited rule. In Connecticut, the traditional

employment at-will doctrine is subject to certain limitations. The present case implicates a public policy exception similar to the one that our Supreme Court recognized in *Sheets* v. *Teddy's Frosted Foods, Inc.*, 179 Conn. 471, 427 A.2d 385 (1980).

In *Sheets*, the plaintiff was a quality control director and operations manager. During the course of his employment, the plaintiff noticed certain deviations from specifications on the defendant's product labels. Those deviations violated statutory provisions, and the plaintiff notified his employer of the mislabeling of products. The defendant terminated the plaintiff several months later. The plaintiff alleged that his dismissal violated an implied contract of employment, violated public policy and was malicious. Id., 473–74.

Our Supreme Court addressed "whether to recognize an exception to the traditional rules governing employment at will so as to permit a cause of action for wrongful discharge where the discharge contravenes a clear mandate of public policy." Id., 474. The court found it significant that the plaintiff in *Sheets* had responsibility for product quality control. Id., 479. Moreover, the legislature had established a public policy of consumer protection. Id. The court did not rest the decision on the violation of a statute governing public policy, stating: "We need not decide whether violation of a state statute is invariably a prerequisite to the conclusion that a challenged discharge violates public policy. Certainly when there is a relevant state statute we should not ignore the statement of public policy that it represents." Id., 480. Even in the absence of a state statute, there is a growing receptivity to recognize as actionable tort claims for wrongful discharge by an employer arising out of termination for an employee's refusal to commit perjury, for filing a workers' compensation claim, for engaging in union activity or for serving on a jury. Id., 476–77. The court determined that a cause of action

for wrongful discharge will lie when the former employee can demonstrate an improper reason for the discharge, "a reason whose impropriety is derived from some important violation of public policy." Id., 475. *Sheets* warns, however, that courts should proceed cautiously in their consideration of whether a public policy violation exists. Id., 477.

Later cases test and define the limits of "an important violation of public policy." Id., 475. Because of the vagueness that inheres in the concept of public policy; *Morris* v. *Hartford Courant Co.*, 200 Conn. 676, 680, 513 A.2d 66 (1986); we must make a case-by-case analysis of employee claims in such cases. *Faulkner* v. *United Technologies Corp.*, 240 Conn. 576, 588–89, 693 A.2d 293 (1997). As background for the present case, we discuss cases in which the factual scenarios legitimately implicate public policy concerns and cases that do not.

In *Morris*, the defendant employer cited misappropriation of company funds as its reason for the plaintiff employee's termination. The plaintiff had brought an action in tort for wrongful discharge, claiming that his employer's false accusations of criminal conduct violated public policy. Our Supreme Court determined that the plaintiff's claim of wrongful discharge did not fall within the narrow *Sheets* exception to the terminable at-will rule because the plaintiff had not identified any public policy that was "affronted by his termination." *Morris* v. *Hartford Courant Co.*, supra, 200 Conn. 680. The plaintiff failed to allege a violation of any explicit statutory or constitutional provision. Id. Moreover, the plaintiff did not allege the contravention of any judicially conceived notion of public policy. Id. Our Supreme Court, therefore, held that an accusation of criminal conduct does not derive from an important violation of public policy and denied the plaintiff's requested relief. Id.

In *Faulkner*, our Supreme Court again considered the issue of wrongful termination, specifically, whether

a federal statute could provide the source for a public policy violation. In *Faulkner*, the plaintiff employee sought to recover for the allegedly wrongful termination of his employment, claiming that his refusal to participate in a scheme to defraud the federal government by using defective parts in the production of helicopters prompted his termination. The plaintiff relied on a federal statute for his claim of a public policy violation.[3]

Our Supreme Court sanctioned a cause of action for wrongful discharge in violation of public policy where that public policy derived from federal law rather than state law. The court held, therefore, that "claims brought pursuant to the public policy limitation on the at-will employment doctrine can be predicated on the violation of a public policy *expressed* in a federal statute." (Emphasis added.) *Faulkner* v. *United Technologies Corp.*, supra, 240 Conn. 585–86. Notably, our Supreme Court did not require the violation of a statute, federal or state, to maintain the cause of action, just a violation of a public policy expressed in a statute. The holdings of *Sheets*, *Faulkner* and *Morris* recognize that explicit statutory or constitutional provisions as well as judicial decisions can define public policy. Id., 585.

In *Parsons* v. *United Technologies Corp.*, 243 Conn. 66, 700 A.2d 655 (1997), our Supreme Court again revisited the public policy limitation on the employment at-will doctrine. In *Parsons*, the plaintiff was an at-will employee for the defendant corporation, which was engaged in the business of manufacturing, distributing and servicing helicopters. The plaintiff worked as an instructor of aircraft maintenance. After several years of employment, the defendant assigned the plaintiff to train several members of a Bahrain helicopter crew, which would require him to reside at a Bahrain military

---

[3] Specifically, the plaintiff in *Faulkner* alleged that his discharge violated the public policy against government contract fraud as embodied in the federal Major Frauds Act. 18 U.S.C. § 1031.

base. Shortly before his scheduled assignment, the United States Department of State issued a travel advisory that counseled against all nonessential travel to Bahrain due to military activity in the Persian Gulf. The plaintiff then notified the defendant that he would not travel to Bahrain because of the perceived threat to his health, safety and welfare. The defendant terminated the plaintiff's employment within two hours of receiving his refusal.

The plaintiff thereafter brought an action for wrongful discharge, claiming that his termination for refusal to travel to Bahrain violated Connecticut public policy requiring an employer to provide its employees with a reasonably safe workplace. The plaintiff relied on several state statutes regulating workplace safety.[4] Our Supreme Court determined that the statutory provisions cited by the plaintiff "reflect[ed] a broad legislative concern for the physical welfare and safety of Connecticut employees. Consequently, we are persuaded that the mandate of public policy that these statutes embody gives a Connecticut employee a cause of action for wrongful discharge against an employer transacting business in Connecticut if the employee is discharged for refusing to work under conditions that pose a substantial risk of death, disease or serious physical harm and that are not contemplated within the scope of the employee's duties." Id., 80. It again is noteworthy that our Supreme Court did not look only for the violation of a statute to find a public policy violation. The *Parsons* court considered broad legislative concerns and public policies expressed in statutes, not strictly statutory violations.

Another recent Supreme Court case addressed the public policy exception to the at-will employment doc-

---

[4] The plaintiff in *Parsons* relied principally on General Statutes §§ 31-49 and 31-370. See *Parsons* v. *United Technologies Corp.*, supra, 243 Conn. 77 n.14 (listing other statutes on which plaintiff relied).

trine. *Daley* v. *Aetna Life & Casualty Co.*, 249 Conn. 766, 734 A.2d 112 (1999). The plaintiff in *Daley* had circulated an internal memorandum detailing her dissatisfaction with her employer's arrangements and accommodation for working parents. The employer terminated the plaintiff's employment shortly after the memorandum's circulation. The plaintiff alleged that her termination violated the public policy of the state of Connecticut not to discriminate against individuals in employment because of their choice to have and raise children, and the public policy to promote employment opportunities for women by encouraging family friendly workplace policies. Our Supreme Court affirmed the trial court's judgment in favor of the employer and found no public policy violation. "We recognize the important public policy embodied in the express provisions of the Connecticut Family and Medical Leave Law [General Statutes § 31-51kk et seq.], the federal Family and Medical Leave Act of 1993 [29 U.S.C. § 2601 et seq.], and [General Statutes] §§ 46a-60 (a) (7) and 17a-101 (a), and underscore every employer's duty to comply with those provisions"; id., 804; but there is no public policy in Connecticut for employers to provide family friendly workplaces. Id., 802.

In light of the principles we glean from those cases, we must now decide whether the act itself, or the act coupled with other statutory or constitutional provisions, expresses a sufficiently clear mandate of public policy to support a cause of action for wrongful discharge despite its limiting definition of "employer." We answer that question in the affirmative.

We first look to the act itself. It declares certain employment practices discriminatory, including "refus[al] to hire or employ or to bar or to discharge from employment any individual . . . because of the individual's . . . sex . . . ." General Statutes § 46a-60 (a) (1). The act also specifically forbids "terminat[ion

of] a woman's employment because of her pregnancy
. . . ." General Statutes § 46a-60 (a) (7). Pursuant to
the act's definitions, an " '[e]mployer' includes the state
and all political subdivisions thereof and means any
person or employer with three or more persons in his
employ"; General Statutes § 46a-51 (10); and " '[d]is-
crimination on the basis of sex' includes but is not
limited to discrimination related to pregnancy [or] child-
bearing capacity . . . ." General Statutes § 46a-51 (17).
The act, through the creation of a commission on human
rights and opportunities, establishes an administrative
mechanism for an employee to lodge a discrimination
complaint in Connecticut.[5]

Prior cases have noted that the General Assembly,
in adopting the act, sought to make state law coexten-
sive with federal antidiscrimination laws. See *Pik-Kwik
Stores, Inc.* v. *Commission on Human Rights & Oppor-
tunities*, 170 Conn. 327, 331, 365 A.2d 1210 (1976). As
with the goals of Title VII of the Civil Rights Act of
1964, 42 U.S.C. § 2000e et seq., the object of our state
statutory counterpart "is the prohibition of discrimina-
tion based on *immutable characteristics* such as race,
color, national origin, or sex. Equal employment *oppor-
tunity* may be secured only when employers are barred
from discriminating against employees on the basis of
*immutable characteristics* . . . ." (Emphasis in origi-
nal; internal quotation marks omitted.) *Pik-Kwik
Stores, Inc.* v. *Commission on Human Rights & Oppor-
tunities*, supra, 331.

In its effort to bring state law into harmony with
federal law, our legislature has announced a clear public
policy against employment discrimination in Connecti-
cut. The question presented in this case, however, is

---

[5] The plaintiff in this case, prior to commencing this action in the Superior
Court, filed a complaint with the commission, which the commission dis-
missed because the defendant had fewer than three employees.

whether employers with fewer than three employees are exempt from the mandate of the fundamental public policy embodied in the state and federal statutory schemes. The court concluded that such an exemption exists.[6] The defendant claims that § 46a-51 (10) is plain and unambiguous, and must therefore be enforced as written. In its brief, the defendant argues that "[t]o allow the plaintiff to circumvent what was clearly in the minds of the legislators would be inappropriate and without basis."

We do not attempt to construe the act to allow the plaintiff a statutory remedy for its violation, for clearly she is without such remedy.[7] The plaintiff seeks a remedy based on public policy. We read the statute to obtain its purpose. As such, the legislature announced a general public policy against sex discrimination in employment.[8] If it were not for the act's application to

[6] The plaintiff also argued to the trial court that Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., provided the basis for a public policy against pregnancy discrimination. In a footnote, the court dismissed that argument, applying the same rationale as it did in rejecting the plaintiff's claim under General Statutes § 46a-51 et seq. Title VII only forbids pregnancy discrimination by employers of fifteen or more persons. See 42 U.S.C. § 2000e (b) and (k). That federal statute, therefore, according to the court, does not articulate a public policy against pregnancy discrimination by employers who hire fewer employees.

[7] The tort of wrongful discharge in contravention of public policy applies uniquely to terminations, not to the broad range of discriminatory practices regulated by the act.

[8] As part of the defendant's statutory construction argument, it maintains that the legislative history of the act confirms that the legislature intended to exempt small employers from the requirements of the act. The defendant cites a statement from a representative of the League of Women Voters of Connecticut, who urged coverage for all employers in the state. Conn. Joint Standing Committee Hearings, Labor, 1967 Sess., p. 142. Because we do not read the act to grant the plaintiff statutory redress, we find it of little importance that certain individuals pushed for adoption of a broader definition of the term employer.

We do note, however, that the legislative history of the 1967 amendment, which added sex as a classification, supports our finding of a public policy against sex discrimination embodied in that act. Representative James J. Kennelly stated: "This bill is in furtherance of this legislature's commitment

employers of fewer than three employees, there is no doubt that the firing of the plaintiff for her pregnancy, if true, would violate the act.

We find it significant that our Supreme Court never has stated explicitly that a statutory violation is an absolute prerequisite for alleging a public policy violation. The defendant relies on *Daley* to argue that we should not impute a statement of public policy beyond that which a relevant statute states because that would "subject the employer who maintains compliance with express statutory obligations to unwarranted litigation for failure to comply with a heretofore unrecognized public policy mandate." *Daley* v. *Aetna Life & Casualty Co.*, supra, 249 Conn. 804.

As we discussed previously, neither *Sheets* nor *Faulkner* required a statutory violation to support a claim of wrongful discharge. *Sheets*, in fact, specifically declined to hold that such violation is required. See *Sheets* v. *Teddy's Frosted Foods, Inc.*, supra, 179 Conn. 480. Moreover, one cannot argue that the eradication of pernicious sex discrimination in employment is a novel concept or a "heretofore unrecognized public policy mandate." Similarly, the *Parsons* court did not rest its decision on the violation of a specific statute. Instead, it examined the "language, history, and public policy underlying the statutory provisions cited by the plaintiff"; *Parsons* v. *United Technologies Corp.*, supra, 243

---

to true equality of opportunity employment. No period in Connecticut legislative achievements has been more enlightened, or more dedicated in the field of human rights . . . . This bill represents continued and expanded implementation of sound and realistic 'human rights' legislation and I respectfully urge its adoption." 12 H.R. Proc., Pt. 6, 1967 Sess., pp. 2567–68. Representative Thomas F. Dowd, Jr., stated: "We on this side of the aisle are very pleased to support this bill for further testimony to Connecticut's committment to non-discriminatory practices in what ever form." Id., p. 2568. Although we find neither of those comments dispositive of the issue, they support a general public policy in Connecticut against sex discrimination.

Conn. 79; and acknowledged the existence of a "broad legislative concern for the physical welfare and safety of Connecticut employees" embodied in several statutes. Id., 80; see also *Emerick* v. *Kuhn*, 52 Conn. App. 724, 741, 737 A.2d 456 ("issue before us is whether the plaintiff's dismissal violated an important public policy *derived* from [several state statutes, a federal regulation or an executive order]" [emphasis added]), cert. denied, 249 Conn. 929, 738 A.2d 653, cert. denied sub nom. *Emerick* v. *United Technologies Corp.*, 528 U.S. 1005, 120 S. Ct. 500, 145 L. Ed. 2d 386 (1999). We conclude that the language, history and public policy underlying the act in the present case reflect a cognizable legislative and societal concern for eliminating discrimination on the basis of sex in Connecticut.

The act *both* embodies a public policy, which is universal for all employees, and provides a statutory remedy, which is limited to employees who work for employers with three or more employees. There are public policy considerations inherent in the question of whether we should uniformly and blindly follow § 46a-51 (10) regardless of the fact situation of the particular case. We determine that the statutory subsection must be read within the boundaries imposed by our public policy as expressed elsewhere in the same statute, other statutes and our constitution.

A distinction exists between the policy underlying a statute and the remedy provided by the statute to accomplish that policy. We are not alone in identifying that distinction. In a case involving an action for wrongful discharge on the basis of sex discrimination in which the defendant employed fewer than the minimum number of employees required by the state antidiscrimination law, the Washington Supreme Court recently stated: "By [the statutory section defining employer] the legislature narrows the statutory remedies but does not narrow the public policy which is broader than the

remedy provided. Thus, the statutory remedy is not in itself an expression of the public policy, and the definition of 'employer' for the purpose of applying the statutory remedy does not alter or otherwise undo to any degree this state's public policy against employment discrimination. . . . If it is argued that the exclusion of small employers from the statutory remedy is itself a public policy, that policy is simply to limit the statutory remedy, but is not an affirmative policy to 'exempt[] small employers from [common law] discrimination suits.' " (Citation omitted.) *Roberts* v. *Dudley*, 140 Wash. 2d 58, 70, 993 P.2d 901 (2000) (en banc). We find the language from *Roberts* persuasive and its reasoning sound.

In its brief, the defendant attempts to distinguish *Roberts* on the ground that "Washington has a different, and clearly more expansive, public policy exclusion than does Connecticut." In *Roberts*, the Washington Supreme Court enumerates the sources for the public policy against sex discrimination. That court first noted that "the purpose of the law [against discrimination] is to deter and to eradicate discrimination in Washington, which has been recognized as a 'policy of the highest priority.' " (Internal quotation marks omitted.) Id., 66. That court then identified several statutory bases for the public policy against discrimination. Those statutes include one headed "Women may pursue any calling open to men" and a general antidiscrimination statute that also contains a specific provision regarding employment discrimination. Id., 67–68.

We agree with the defendant that the Washington legislature has enacted more explicit antidiscrimination statutes than the Connecticut legislature, but our Supreme Court, as well as the Washington Supreme Court, has recognized the importance of ending discrimination. See *Pik-Kwik Stores, Inc.* v. *Commission on Human Rights & Opportunities*, supra, 170 Conn. 331.

We do not necessarily equate a more explicit statute with a more comprehensive fundamental public policy. Our public policy has existed with decisional force for nearly three decades. The firing of an employee because of pregnancy, of course, applies to women only. Connecticut has abolished sex discrimination by its constitution and by legislation. Our history "evidences a firm commitment . . . to do away with sex discrimination altogether." *Evening Sentinel* v. *National Organization for Women,* 168 Conn. 26, 34, 357 A.2d 498 (1975). Sex classification in some instances constitutes a per se violation of Connecticut law. *Evening Sentinel* held that such classification in help wanted advertising is such a violation. Id.

Certain other state statutes, federal statutes and the constitution of Connecticut provide further support for our conclusion that a public policy against sex discrimination, including discrimination based on pregnancy, exists. Encompassed within chapter 814c of the General Statutes, which is titled "Human Rights and Opportunities," for example, are numerous other statutory provisions that prohibit discrimination based on sex in certain circumstances.[9] Federal laws, which we do not attempt to list exhaustively and which, under *Faulkner,* can provide the source for a public policy, such as Title VII of the Civil Rights Act of 1964, the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601 et seq., and

[9] General Statutes § 46a-58 (prohibiting deprivation of rights on account of sex); General Statutes § 46a-64 (prohibiting discriminatory public accommodations practices); General Statutes § 46a-64c (prohibiting discriminatory housing practices); General Statutes § 46a-66 (prohibiting discriminatory credit practices); General Statutes § 46a-70 (guaranteeing equal employment in state agencies); General Statutes § 46a-71 (prohibiting discriminatory practices by state agencies); General Statutes § 46a-72 (prohibiting discrimination in job placement by state agencies); General Statutes § 46a-73 (prohibiting discrimination in state licensing and charter procedures); General Statutes § 46a-75 (prohibiting discrimination in educational and vocational programs); General Statutes § 46a-76 (prohibiting discrimination in allocation of state benefits).

the Pregnancy Discrimination Act of 1978, 42 U.S.C. § 2000e (k), similarly announce a public policy against sex discrimination.

Furthermore, our own constitution announces a public policy against sex discrimination. The equal protection clause of the constitution of Connecticut, article first, § 20, as amended by article twenty-one of the amendments to the constitution, provides: "No person shall be denied the equal protection of the law nor be subjected to segregation or discrimination in the exercise or enjoyment of his or her civil or political rights because of . . . sex . . . ." All protections contained in article first are fundamental civil liberties. *Horton* v. *Meskill*, 172 Conn. 615, 641–42, 376 A.2d 359 (1977). The right to be free from discrimination is, therefore, a fundamental civil liberty.

The court rejected the plaintiff's argument that the constitution of Connecticut could provide the basis for a recognition of a public policy against pregnancy discrimination by small employers. It determined that the plaintiff's termination did not involve any state action necessary to trigger protection under our constitution because the defendant is a private actor. In its brief, the defendant agrees with the court and argues that "[a]rticle first, § 20 of the Connecticut constitution is irrelevant to the present argument because, although it does prohibit pregnancy discrimination, both the Connecticut Supreme Court and the United States District Court for [the District of] Connecticut have held that article first, § 20, requires state action and does not apply to private conduct as alleged here."

The Supreme Court of California considered and rejected a similar argument in *Rojo* v. *Kliger*, 52 Cal. 3d 65, 90, 801 P.2d 373, 276 Cal. Rptr. 130 (1990).[10] We

[10] In *Rojo*, the Supreme Court of California did not address the precise issue presented by the facts of our case because the employer fell within the scope of the relevant antidiscrimination statute. In its determination of whether sex discrimination in employment may support a claim of tortious

find the argument unavailing for the same reasons as did the Supreme Court of California, which stated: "For our purposes here, however, whether article I, section 8 [of the California constitution] applies exclusively to state action is largely irrelevant; the provision unquestionably reflects a fundamental *public policy* against discrimination in employment—public or private—on account of sex. . . . Regardless of the precise scope of its application, article I, section 8 is declaratory of this state's fundamental public policy against sex discrimination . . . ."[11] (Citations omitted; emphasis in original.) Id. We reach the same conclusion with respect to article first, § 20, of the constitution of Connecticut as amended by article twenty-one of the amendments.

The statutes and the constitutional amendment that we have discussed evidence a strong legislative intent to end discrimination on account of sex. A statute, such as the act involved in this case, that simply limits redress to fewer individuals does not circumscribe or undermine that strong public policy. Rather, the act excludes certain employers from the administrative process, but not from the fundamental policy declared in that statute, other statutes and the state constitution.

The law of several other states is in harmony with our decision. The Supreme Court of Ohio reached a similar result in *Collins* v. *Rizkana*, 73 Ohio St. 3d 65, 652 N.E.2d 653 (1995). That court found a sufficient expression of public policy in two statutes that protect sexual bodily security and integrity, prohibit offensive sexual contact and prohibit prostitution to override another statute that exempted a defendant employer

discharge in contravention of public policy, however, it needed to consider the existence of a fundamental public policy.

[11] It is noteworthy that the Supreme Court of California has interpreted the relevant California constitutional provision as applying to both state and private action. *Commodore Home Systems, Inc.* v. *Superior Court*, 32 Cal. 3d 211, 220, 649 P.2d 912, 185 Cal. Rptr. 270 (1982).

from liability because he employed fewer than the minimum number of employees. In its brief, the defendant argues that the Supreme Court of Ohio referred only to those specific statutes and did not interpret a statute such as the one that exists in Connecticut.

To the contrary, the Ohio court based its finding of a public policy against sexual harassment on the two statutes *and* on an antidiscrimination civil rights statute similar to the act at issue in the present case. As with its Connecticut counterpart, the Ohio statute declares it an unlawful discriminatory practice for an employer to discriminate because of race, color, religion, sex, national origin, handicap, age or ancestry. Id., 72. The Ohio court, therefore, did interpret a similar statute and did not premise the finding of a violation of public policy uniquely on the two statutes governing prostitution and sexual bodily integrity.

We do not interpret § 46a-51 (10), which defines "employer" as one hiring fewer than three employees, as evincing an intent by the General Assembly to grant small businesses a license to discriminate against their employees, however few, with impunity. Instead, we can only read that section as evidencing an intention to exempt small businesses from the burdens of other provisions of the act, not from its antidiscrimination policy. See *Kerrigan* v. *Magnum Entertainment, Inc.*, 804 F. Sup. 733, 736 (D. Md. 1992); *Collins* v. *Rizkana*, supra, 73 Ohio St. 3d 74.

The defendant also argues that *Williamson* v. *Greene*, 200 W. Va. 421, 490 S.E.2d 23 (1997), and *Molesworth* v. *Brandon*, 341 Md. 621, 672 A.2d 608 (1996), both of which recognize a cause of action for wrongful discharge in violation of public policy despite the employers' exclusion from the respective state antidiscrimination statutes, are distinguishable from the present case because the preamble to those statutes

includes specific language that it is the public policy of the particular state to end discrimination. We find that distinction of little importance. That the legislatures in those states chose to identify with specificity the public policy of their respective states does not alter the effect of less specific expressions of public policy that have been made by our General Assembly in other statutes. The existence of a public policy does not hinge on the use of precise phraseology such as "it is the public policy of this state." See *Payne* v. *Rozendaal*, 147 Vt. 488, 520 A.2d 586 (1986) (recognizing public policy against age discrimination despite state statute not including age and employer having too few employees to trigger federal statute).

In its brief, the defendant cites *Jennings* v. *Marralle*, 8 Cal. 4th 121, 876 P.2d 1074, 32 Cal. Rptr. 2d 275 (1994), as supportive of its position and states that "*Jennings* is the closest analogy." In its memorandum of decision, the court also cited *Jennings* as support for its decision not to recognize a cause of action. We disagree that *Jennings* applies to the facts of the present case.

In *Jennings*, the Supreme Court of California determined that a terminated employee without a statutory remedy may not maintain a common-law tort action for damages for wrongful discharge in violation of a public policy against *age discrimination*. The California court stated that "while the Legislature has made a broad statement of policy, it has not extended that policy to small employers." Id., 130. The decision in *Jennings* rests, however, primarily on the fact that "*no other statute or constitutional provision* bars age discrimination . . . ." (Emphasis added.) Id., 125. The court, therefore, concluded that there presently exists no "fundamental policy" that precludes age discrimination by a small employer.

Subsequent California cases and a recent Utah Supreme Court case explain the rationale driving the

*Jennings* decision and highlight the reasons for which that case is inapposite here. In *Badih* v. *Myers*, 36 Cal. App. 4th 1289, 43 Cal. Rptr. 2d 229 (1995), the California Court of Appeal recognized a cause of action for wrongful discharge in violation of the public policy against pregnancy discrimination despite the fact that the employer fell outside the definition of the term employer under the state antidiscrimination statute. The court found *Jennings* inapplicable and determined that the California constitution expressed a fundamental public policy against sex discrimination in employment. The court agreed with the plaintiff employee that "*Jennings* is distinguishable on the ground that pregnancy discrimination in employment is a form of sex discrimination, and, as such, is prohibited not only by the [state antidiscrimination law] but also by article I, section 8 of the California Constitution." Id., 1293.

Similarly, in both *Green* v. *Ralee Engineering Co.*, 19 Cal. 4th 66, 960 P.2d 1046, 78 Cal. Rptr. 2d 16 (1998), and *Stevenson* v. *Superior Court*, 16 Cal. 4th 880, 941 P.2d 1157, 66 Cal. Rptr. 2d 888 (1997), the Supreme Court of California reviewed the relevant case law concerning exceptions to the at-will employment doctrine in California. In both cases, the court, recognizing the limited application of the *Jennings* rationale, cited specific portions of *Jennings* that emphasized the absence of other state laws barring discrimination on the basis of age. *Green* v. *Ralee Engineering Co.*, supra, 79; *Stevenson* v. *Superior Court*, supra, 893.

A recent Utah Supreme Court case has also elucidated the rationale of *Jennings*. In *Burton* v. *Exam Center Industrial & General Medical Clinic, Inc.*, 994 P.2d 1261, 1266 (Utah 2000), the Utah Supreme Court, relying on *Jennings*, stated: "There is no such constitutional or statutory declaration of public policy in Utah against discrimination on account of age in the termination of employment of employees of small employers."

Those cases establish the inapplicability of *Jennings* to this case, which involves a public policy against sex discrimination, because, unlike age discrimination, many statutory and constitutional provisions address the need to end sex discrimination.

There are a "myriad of employees without the bargaining power to command employment contracts for a definite term," and they are "entitled to a modicum of judicial protection" when their rights, as established in the public policy of the state, are contravened. *Sheets* v. *Teddy's Frosted Foods, Inc.*, supra, 179 Conn. 477. We hold that there is a public policy against sex discrimination in employment sufficiently expressed in statutory and constitutional law to permit a cause of action for wrongful discharge. As stated many years ago in *Evening Sentinel*, sex classification is a per se violation of Connecticut law. Although § 46a-51 (10) excludes many employers from the requirements of the act, our clear public policy as to sex discrimination transcends such an exclusion.

Here, the plaintiff has stated a cause of action against the defendant. According to the affidavit filed with the defendant's motion for summary judgment and the plaintiff's counteraffidavit, a question of fact as to whether the defendant fired the plaintiff for ineptitude or pregnancy remains to be resolved.

The judgment is reversed and the case is remanded for further proceedings in accordance with law.

In this opinion SCHALLER, J., concurred.

FLYNN, J., concurring. I concur with the result and most of the rationale of the majority's opinion. Certainly, there is a strong public policy in our state that women should be treated equally with men under our laws. I agree that policy is strongly and clearly expressed in article twenty-one of the amendments to

the constitution of Connecticut, the resolution of our General Assembly approving the federal Equal Rights Amendment,[1] provisions of federal laws cited by the majority and by our Supreme Court in *Evening Sentinel* v. *National Organization for Women*, 168 Conn. 26, 357 A.2d 498 (1975). Not only is that policy a strong and clear one, but it is a fundamental one when a person's claim of deprivation of those equal rights arises out of her pregnancy. Both sexes cooperate in the procreation of the human race, but only women become pregnant, carry precious human life within them and give birth. To discriminate against persons because of pregnancy is to discriminate against women. *Newport News Shipbuilding & Dry Dock Co.* v. *Equal Employment Opportunity Commission*, 462 U.S. 669, 684, 103 S. Ct. 2622, 77 L. Ed. 2d 89 (1983). The guarantee of equal rights for pregnant women is not only a strong and clear public policy, but a fundamental one that addresses the very continuance of the human race. If the need to uphold the public policy expressed in our pure food and drug laws justified an exception to the at-will status of the employee in *Sheets* v. *Teddy's Frosted Foods, Inc.*, 179 Conn. 471, 427 A.2d 385 (1980), the right to equal protection of our laws enjoyed by a woman in the workplace who is pregnant and wrongfully terminated from employment for that reason is stronger. But more—it is fundamental to any system of jurisprudence worthy of the name.

I write separately because I would not ground the public policy used to make the *Sheets* claim in the very statute, the Fair Employment Practices Act, General Statutes § 46a-51 et seq., which also makes the legislative determination that it will not permit a remedy under that act against an employer with fewer than three employees. Instead, I would look to the act only to ensure that its policy is not at odds with the public

---

[1] House J.R. No. 1, Jan. Sess., Pt. 1, Vol. 1, 1973 Public Acts, p. LXXIV.

policy we find elsewhere, conclude that the act's statutory policy is consistent with the strong, clear and fundamental public policy we find in the other sources, and permit a *Sheets* type remedy if the at-will employee in the small workplace can prove her claim that she was wrongfully discharged because of pregnancy.