******************************************************

The ''officially released'' date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the ''officially released'' date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# TIM DUNN *v.* NORTHEAST HELICOPTERS
# FLIGHT SERVICES, L.L.C.
## (AC 43594)

Prescott, Moll and Alexander, Js.

*Syllabus*

The plaintiff sought to recover damages for the allegedly wrongful termination of his employment by N Co., which operated a helicopter flight training school, claiming that J, the owner of N Co., in violation of statute (§ 31-73 (b)), had demanded 50 percent of future proceeds from a separate flight examination business the plaintiff sought to undertake as a condition of his continued at-will employment as N Co.'s chief flight instructor. The Federal Aviation Administration had approached the plaintiff about an open independent flight examiner position and the possibility of the plaintiff starting his own business as a certified FAA flight examiner. The plaintiff and J viewed the opportunity as a positive development for the plaintiff and for N Co. The plaintiff thereafter approached J about a loan to cover the costs related to a training program the plaintiff had to attend to obtain FAA flight examiner certification. J expressed willingness to loan the plaintiff the money if the plaintiff would remit to N Co. any examination fees he would later receive, until the loan was paid off, and agree to share equally with N Co. all examination fees he would thereafter collect. The plaintiff did not respond to J's proposals and did not take a loan from J. The plaintiff later explained in a text message to R, J's wife and an employee of N Co., that he had paid the costs of the training program because he wanted to keep his employment with N Co. and his new flight examination business separate. R responded to the plaintiff, stating that J had said that he should clean out his desk and that he no longer worked for N Co. The trial court denied the plaintiff's motion for summary judgment and granted N Co.'s motion for summary judgment, concluding that the undisputed facts did not raise a genuine issue of material fact that N Co. violated the public policy underlying § 31-73 (b), which prohibits employers from demanding money from employees as a condition of continued employment. The court thereafter rendered judgment for N Co., and the plaintiff appealed to this court. *Held* that the trial court properly granted N Co.'s motion for summary judgment and denied the plaintiff's motion for summary judgment, as § 31-73 was inapplicable to the undisputed facts of the case and could not, as a matter of law, provide a basis for the plaintiff's wrongful termination action: although J's onetime proposal for a potential fee sharing relationship occurred in the context of an existing employer-employee relationship, it did not fall within the type of coercive behavior that § 31-73 forbids, as J's request or demand for money from the plaintiff could not reasonably be attributed to the plaintiff's employment relationship with N Co. but, rather, involved negotiations related to a separate, albeit related, future business venture between the parties, and, as the employment at will doctrine permits an employer to discharge an employee for any reason, including anger or displeasure that arises from an employee's refusal to participate in a future side business proposed by the employer, an employer that discharges an at-will employee on that basis has not violated § 31-73 or any clear public policy that should subject the employer to a claim of wrongful termination; moreover, § 31-73 limits the employment at will doctrine only by carving out an exception that prohibits an employer from coercing financial considerations from an employee or by conditioning future or continued employment on the employee's capitulation to the employee's demands, and, even if § 31-73 were applicable as a matter of law, the plaintiff failed to present evidence to raise a genuine issue of material fact that J had ever conditioned his continued employment on acceptance of the fee sharing offer or that there was an understanding to that effect, the temporal proximity between the plaintiff's rejection of J's proposal and the termination of the plaintiff's employment was insufficient to trigger the exception to the employment at will doctrine pursuant to § 31-73, the plaintiff did

not indicate whether he was interested in J's proposal at the time it was made, J never asked him again or sought any commitment or threatened retaliation, and, contrary to the plaintiff's assertion, a trier of fact could not reasonably infer from the termination of his employment alone that J had implicitly conditioned continued employment on the plaintiff's agreement with the fee sharing proposal, the plaintiff having failed to present any evidentiary basis from which to conclude that J ever actually used the prospect of renewed or continued employment as leverage to obtain a fee splitting agreement with him.

Argued January 19—officially released August 3, 2021

*Procedural History*

Action to recover damages for the alleged wrongful termination of the plaintiff's employment, and for other relief, brought to the Superior Court in the judicial district of Tolland, where the defendant filed a counterclaim; thereafter, the defendant withdrew the counterclaim; subsequently, the trial court, *Farley, J.*, granted the defendant's motion for summary judgment as to the first count of the complaint, denied the plaintiff's motion for summary judgment on the complaint and the defendant's claim for setoff, and rendered judgment for the defendant; thereafter, the plaintiff withdrew the second count of the complaint and appealed to this court. *Affirmed.*

*Megan L. Michaud*, for the appellant (plaintiff).

*Michael C. Harrington*, for the appellee (defendant).

*Opinion*

PRESCOTT, J. In this civil action, the plaintiff, Tim Dunn, alleges wrongful termination of employment in violation of public policy. See *Sheets* v. *Teddy's Frosted Foods, Inc.*, 179 Conn. 471, 474–77, 427 A.2d 385 (1980). The issue before us is whether the trial court improperly concluded that the plaintiff failed to demonstrate the existence of a genuine issue of material fact pertaining to whether, by terminating his at-will employment in the manner alleged, the defendant, his former employer, Northeast Helicopters Flight Services, L.L.C., violated General Statutes § 31-73 (b) and the public policy underlying that statute, which prohibits employers from coercing an employee to refund wages or related sums of money to the employer, or from withholding wages due and owing to an employee, as a condition either to secure or to continue employment.[1] The plaintiff appeals from the summary judgment rendered in favor of the defendant.[2] Because we agree that there are no genuine issues of material fact and that the defendant is entitled to judgment as a matter of law, we affirm the judgment of the court.

The record before the court, viewed in the light most favorable to the plaintiff as the nonmoving party on the prevailing motion for summary judgment, reveals the following facts and procedural history. The defendant is owned by John Boulette. It operates a helicopter flight training school in Ellington. The defendant hired the plaintiff in 2006 as a flight instructor. The defendant later promoted the plaintiff to chief flight instructor, and he held that position through October, 2017, at which time the defendant terminated his employment. The plaintiff did not have an employment contract with the defendant and, thus, was an at-will employee. See *Thibodeau* v. *Design Group One Architects, LLC*, 260 Conn. 691, 697, 802 A.2d 731 (2002).

For a student pilot to become a certified helicopter pilot, that person must be certified by the Federal Aviation Administration (FAA) following an examination (exam). Although the defendant and the plaintiff were authorized to provide classroom and flight training to pilots in preparation for that exam, they were not licensed by the FAA to administer the exam. Without an FAA certified flight examiner on its staff, the defendant would make arrangements for an FAA examiner to come to the defendant's facility in Ellington to administer the exam to its students. As of 2017, the nearest certified flight examiner was located two hours away from the defendant's facilities, and students often had to wait weeks to schedule an exam.

Throughout his employment with the defendant, the plaintiff and Boulette had discussed the potential advantages of having a certified flight examiner on staff.[3] In May, 2017, the FAA approached the plaintiff about an

open independent flight examiner position and the possibility of the plaintiff starting his own business as an FAA examiner. The FAA indicated that the plaintiff would be a suitable candidate but that he would need to apply and to complete the required training. The plaintiff advised Boulette of the flight examiner position, and Boulette told him that "we should jump on the opportunity." The plaintiff and Boulette each viewed the plaintiff's opportunity to become a flight examiner as a positive development for both the plaintiff and the defendant.[4]

To obtain his FAA flight examiner certification, the plaintiff had to attend a training program in Oklahoma in late September, 2017. In August, 2017, the plaintiff approached Boulette about a loan to cover the costs of his travel to Oklahoma and other related expenses. Boulette stated his willingness to loan the plaintiff the money if the plaintiff agreed to remit to the defendant any exam fees he later would receive until the loan was paid off. At that time, Boulette also proposed that, after the loan debt was satisfied, the plaintiff and the defendant should agree to share equally in all future examination fees collected by the plaintiff. The plaintiff did not respond to Boulette's proposals at that time either positively or negatively and never again spoke with Boulette directly about the proposed loan or fee sharing plan. Several weeks later, however, the plaintiff had a conversation with Boulette's wife, Rhonda Boulette, an employee of the defendant, and told her that he was not willing to share any fees from the examination business with the defendant. Rhonda Boulette's response was, "that is fine," and, "[d]on't worry about it."

Toward the end of September, 2017, the plaintiff attended the FAA training program. On October 16, 2017, after he had returned from the training program, he received a text message from Rhonda Boulette asking him why his expenses related to the FAA training had not shown up on the defendant's company credit card statement. He replied that he had paid the expenses himself because he wanted to keep his employment with the defendant and his new flight examination enterprise separate—his intention being to retain all exam fees for himself. Rhonda Boulette responded that John Boulette said that he should clean out his desk and that he no longer worked for the defendant. The plaintiff stated simply, "[w]ill do."[5]

Throughout his employment with the defendant, the plaintiff earned a weekly salary of $1000 plus an additional hourly rate of $25 for time spent flying, which amount varied from week to week. Following the termination of the plaintiff's employment, the defendant paid him his full hourly rate for all the flight training hours he had worked during his last week of employment. The defendant, however, did not pay him his $1000 base salary for that week. The defendant reasoned that it

was not required to pay the plaintiff his final weekly salary because he had received a salary for the week that he had attended the FAA training program in September.

The plaintiff commenced the underlying action against the defendant in November, 2017. He filed the operative second amended complaint on February 21, 2018. Count one of that complaint asserted a cause of action for common-law wrongful discharge premised on the principles first established in *Sheets* v. *Teddy's Frosted Foods, Inc.*, supra, 179 Conn. 474–77 (recognizing common-law cause of action in tort for discharge of at-will employee if former employee able to prove "demonstrably improper reason for dismissal, a reason whose impropriety is derived from some important violation of public policy"). Specifically, the plaintiff claimed that the termination of his employment was unlawful because the defendant had demanded that he pay the defendant a sum of money—50 percent of any future proceeds resulting from the plaintiff's examination business—allegedly in violation of § 31-73 (b) and the public policy underlying that statute. Count two asserted a claim pursuant to General Statutes § 31-72[6] for nonpayment of wages, which was based on the defendant's withholding of the plaintiff's base salary for his final week of employment.

The defendant thereafter filed a motion to strike count one of the complaint. It claimed that the facts alleged in the complaint failed to state a claim on which relief could be granted. In part, the defendant argued that the complaint contained no allegation that the defendant ever expressly conditioned the plaintiff's continued employment on remittance to the defendant of a share of future exam proceeds collected by the plaintiff, and that the plaintiff needed to allege and to prove that such a quid pro quo had occurred to establish a violation of § 31-73. In response to the motion to strike, the plaintiff argued, inter alia, that, although the defendant "did not specifically say it was a condition of [the] plaintiff's continued employment to pay 50 percent of the proceeds from his separate business, it can reasonably be inferred that this was a condition of [his] continued employment . . . ." Following argument, the court, *Sferrazza, J.*, issued a one sentence decision on June 19, 2018, denying the motion to strike. The court stated: "The factual allegations of the first count are sufficient, if proved, to support a cause of action for wrongful [discharge from] employment under the doctrine of *Sheets* v. *Teddy's Frosted Foods, Inc.*, [supra, 179 Conn. 471]."

On August 17, 2018, the defendant filed an answer to the complaint. The answer included special defenses, a two count counterclaim sounding in breach of contract and unjust enrichment, and a claim to a right of setoff that was based on the plaintiff's failure to repay

in full a loan allegedly provided by the defendant to the plaintiff and his wife for a down payment on a home.

On March 1, 2019, the plaintiff filed a motion seeking summary judgment in his favor on both counts of the complaint, on the defendant's counterclaim, and on the claim of setoff. Together with the motion, the plaintiff filed a memorandum of law, to which he attached excerpts of deposition testimony by the plaintiff and the Boulettes; copies of text messages between the plaintiff and Rhonda Boulette; and a copy of the plaintiff's final pay stub from the defendant. According to the plaintiff, he was entitled to summary judgment because there were no material facts in dispute, and certain "admissions" contained in the deposition excerpts demonstrated that the plaintiff had established liability for both wrongful termination and failure to pay wages. Further, according to the plaintiff, both counts of the defendant's counterclaim and the claim of setoff were entirely frivolous and unsupported by any evidence.

The defendant, on March 7, 2019, filed a motion for summary judgment with respect to count one of the complaint only. It agreed that there were no issues of material fact in dispute but that judgment should be rendered in its favor as a matter of law. The defendant essentially argued that § 31-73 (b) is inapplicable with respect to the factual circumstances present and that it had a number of valid and permissible reasons for terminating the plaintiff's employment, including, but not limited to, the way in which he had chosen to handle the FAA examiner issue. The defendant also submitted additional portions of deposition testimony and other exhibits along with its memorandum of law in support of its motion for summary judgment.

On April 15, 2019, the defendant filed a memorandum of law in opposition to the plaintiff's motion for summary judgment. The following day, the defendant filed a withdrawal of the unjust enrichment count of its counterclaim. That same day, the plaintiff filed his memorandum of law in opposition to the defendant's motion for summary judgment. On May 6, 2019, the day that the motions for summary judgment were calendared for oral argument, the defendant filed a withdrawal of the remaining breach of contract count of its counterclaim. During oral argument on the motions for summary judgment, the court, *Farley, J.*, clarified with the parties that all that remained in the action before the court following the withdrawal of both counts of the defendant's counterclaim were the two counts of the complaint and the defendant's claim of setoff.

After hearing argument on the motions for summary judgment, the court, on August 30, 2019, issued a memorandum of decision disposing of the motions. The court stated in part: "In this case, the court is asked to decide whether an employer's termination of an at-will employee, after the employee refused to share the

future proceeds generated by the employee's proposed new business venture in a field related to the employer's business, violates . . . § 31-73 (b) and gives rise to a cause of action for wrongful termination based on a violation of public policy. Both parties have moved for summary judgment on count one of the [operative complaint] alleging wrongful termination, and both motions turn on this question. The court concludes that the undisputed facts, construed favorably to the plaintiff, do not establish a violation of § 31-73 (b), and, therefore, the plaintiff cannot pursue a wrongful termination claim.

"The plaintiff has also moved for summary judgment on the second count of the complaint, alleging nonpayment of wages, as well as the defendant's claim of setoff. Summary judgment on those claims is precluded, however, by the existence of genuine issues of material fact.

"The court denies the plaintiff's motion for summary judgment as to both counts [of the complaint] and the defendant's setoff claim, and grants the defendant's motion for summary judgment as to count one [of the complaint]." This appeal followed.[7]

The plaintiff claims on appeal that, with respect to count one of the complaint alleging wrongful discharge in violation of public policy, the court improperly granted the defendant's motion for summary judgment and denied his own motion for summary judgment. The plaintiff argues that the court incorrectly determined that he had failed as a matter of law to establish a violation of § 31-73 (b) on the basis of the undisputed facts presented.[8] We are not persuaded.

We begin with relevant legal principles, starting with the applicable standard of review. The standard that governs our review of a court's ruling on a motion for summary judgment is well settled. "Practice Book § [17-49] provides that summary judgment shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. . . . In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party. . . . The party seeking summary judgment has the burden of showing the absence of any genuine issue [of] material facts which, under applicable principles of substantive law, entitle him to a judgment as a matter of law . . . and the party opposing such a motion must provide an evidentiary foundation to demonstrate the existence of a genuine issue of material fact. . . . [I]ssue-finding, rather than issue-determination, is the key to the procedure. . . . [T]he trial court does not sit as the trier of fact when ruling on a motion for summary judgment. . . . [Its] function is not to decide issues of material fact, but rather to determine whether

any such issues exist. . . . Our review of the decision to grant a motion for summary judgment is plenary. . . . We therefore must decide whether the court's conclusions were legally and logically correct and find support in the record." (Internal quotation marks omitted.) *Barbee* v. *Sysco Connecticut, LLC*, 156 Conn. App. 813, 817–18, 114 A.3d 944 (2015). Moreover, to the extent that our review requires us to engage in statutory construction, that presents a question of law over which we also exercise plenary review. See, e.g., *Kayla M.* v. *Greene*, 163 Conn. App. 493, 499, 136 A.3d 1 (2016).[9]

We turn next to the law applicable to common-law wrongful discharge claims premised on the very narrow public policy exception to at-will employment first recognized in *Sheets* v. *Teddy's Frosted Foods, Inc.*, supra, 179 Conn. 471. "In Connecticut, an employer and employee have an at-will employment relationship in the absence of a contract to the contrary. Employment at will grants both parties the right to terminate the relationship for any reason, or no reason, at any time without fear of legal liability. Beginning in the late 1950s, however, courts began to carve out certain exceptions to the at-will employment doctrine, thereby giving rise to tort claims for wrongful discharge. Certain employer practices provoked public disfavor, and unlimited employer discretion to fire employees eventually yielded to a more limited rule. . . .

"Following that trend, [our Supreme Court], in *Sheets* v. *Teddy's Frosted Foods, Inc.*, [supra, 179 Conn. 471], sanctioned a common-law cause of action for wrongful discharge in situations in which the reason for the discharge involved impropriety derived from some important violation of public policy. . . . In doing so, [the court] recognized a public policy limitation on the traditional employment at-will doctrine in an effort to balance the competing interests of employers and employees. . . . In *Morris* v. *Hartford Courant Co.*, [200 Conn. 676, 513 A.2d 66 (1986)], [our Supreme Court] recognized the inherent vagueness of the concept of public policy and the difficulty encountered when attempting to define precisely the contours of the public policy exception. In evaluating claims, [reviewing courts] look to see whether the plaintiff has . . . alleged that his discharge *violated any explicit statutory or constitutional provision* . . . or whether he alleged that his dismissal contravened any judicially conceived notion of public policy." (Citations omitted; emphasis added; internal quotation marks omitted.) *Thibodeau* v. *Design Group One Architects, LLC*, supra, 260 Conn. 697–99.

"Although [our Supreme Court has] been willing to recognize, pursuant to *Sheets* and its progeny, a claim for wrongful termination in appropriate cases, [it] *repeatedly* ha[s] underscored [an] adherence to the principle that the public policy exception to the general

rule allowing unfettered termination of an at-will employment relationship *is a narrow one* . . . . Consequently, [courts] have rejected claims of wrongful discharge that have not been predicated upon an employer's violation of *an important and clearly articulated* public policy." (Citations omitted; emphasis added; internal quotation marks omitted.) Id., 700–701; see also *Sheets* v. *Teddy's Frosted Foods*, *Inc.*, supra, 179 Conn. 477 (warning of difficulties inherent in "deciding where and how to draw the line between claims that genuinely involve the mandates of public policy and are actionable, and ordinary disputes between employee and employer that are not," and cautioning courts that they should "not lightly intervene to impair the exercise of managerial discretion or to foment unwarranted litigation").[10]

In the present case, the plaintiff advances § 31-73 (b) as the statutory basis for the defendant's alleged public policy violation. Accordingly, we examine that statute and available precedent applying it to determine what, if any, important public policy it embodies and whether there exists a genuine issue of material fact as to whether the defendant's actions violated the statute. As previously noted, the text of § 31-73 (b) provides in relevant part that "[n]o employer . . . shall, directly or indirectly, demand, request, receive or exact any refund of wages, fee, sum of money or contribution from any person, or deduct any part of the wages agreed to be paid, upon the representation or the understanding that such refund of wages, fee, sum of money, contribution or deduction is necessary to secure employment or continue in employment. No such [employer] shall require, request or demand that any person agree to make payment of any refund of wages, fee, contribution or deduction from wages in order to obtain employment or continue in employment. A payment to any person of a smaller amount of wages than the wage set forth in any written wage agreement or the repayment of any part of any wages received, if such repayment is not made in the payment of a debt evidenced by an instrument in writing, shall be prima facie evidence of a violation of this section." General Statutes § 31-73 (b). Subsection (d) of § 31-73 sets forth various criminal penalties that may be imposed on an employer who violates subsection (b), including incarceration and fines.

We are aware of only two appellate cases that previously have construed § 31-73 (b). See *Mytych* v. *May Dept. Stores Co.*, 260 Conn. 152, 165–66, 793 A.2d 1068 (2002); *Lockwood* v. *Professional Wheelchair Transportation*, *Inc.*, 37 Conn. App. 85, 654 A.2d 1252, cert. denied, 233 Conn. 902, 657 A.2d 641 (1995). We discuss each of these cases in turn.

In *Lockwood* v. *Professional Wheelchair Transportation*, *Inc.*, supra, 37 Conn. App. 85, this court reversed

the judgment of the trial court, which had directed a verdict in favor of the defendant employer in an action brought by a former employee for wrongful discharge in violation of public policy. The plaintiff employee had been in a work-related accident that triggered coverage under the employer's insurance policy. The employee thereafter was suspended from work. The employer made repeated demands to the employee that he pay the employer $1000 to cover the deductible required under the insurance policy and expressly conditioned the plaintiff's return to work on that payment, despite a ruling in small claims court that the employee was not legally liable for the insurance deductible. Id., 87–88. This court held that, "[a]t the close of evidence, sufficient facts existed to allow a jury to find that [the employee] was discharged from his employment . . . because he refused to pay the $1000. A finding of these facts by the jury would support the conclusion that [the employer discharged the employee] in violation of public policy as set forth in § 31-73." Id., 92.

In reaching that conclusion, this court construed the language of § 31-73 (b) as "clear and unambiguous," and stated that "[i]t prohibits an employer from demanding any sum of money from an individual as a requirement of employment or as a requirement for continued employment." Id. This court noted that the trial court mistakenly had "relied on two [a]ttorney [g]eneral [o]pinions [by] limiting the application of § 31-73 to preventing a . . . kick-back . . . system from being used to exact a payment from an employee to an employer in return for that employee's hiring. The trial court's interpretation of § 31-73 is not in accord with the clear language of the statute and therefore runs afoul of the well recognized rules of statutory construction adopted by our Supreme Court."[11] (Internal quotation marks omitted.) Id. In other words, this court concluded that the trial court had construed the statute far too narrowly in directing a verdict for the employer.

In discussing whether § 31-73 contains "an important public policy," the court in *Lockwood* held: "Section 31-73 represents a clear public policy prohibiting an employer from *taking advantage of the employment relationship* by using the acquisition or continuation of employment as a mechanism for exacting sums of money from an employee. The statute is written in broad and sweeping language to prohibit such actions by an employer. The discharge of an employee for . . . refusing *to refund a portion of his wages* violates public policy as expressed in § 31-73." (Emphasis added.) Id., 94–95. Although nothing in *Lockwood* directly linked the deductible payment sought by the employer to any specific wages paid to the employee or to the withholding of any wages due, the court plainly construed any payment made by the plaintiff of the $1000 deductible as necessarily coming from wages attributable to his employment and, as a result, construed the employer's

demand as a "refund [of] a portion of his wages," which was prohibited under the statute. Id., 95.

We now turn to *Mytych* v. *May Dept. Stores Co.*, supra, 260 Conn. 155–57, in which the issue before the court was whether an employer's practice of deducting from an employee salesperson's compensation the cost of returned merchandise violated § 31-73. The court held that it did not. Id., 166. The court reasoned that, although an employer cannot require an employee to *refund wages that have previously been earned* as a condition of continued employment, calculating wages in the manner described did not violate § 31-73 because the employee was aware of the practice when she was hired and in fact had agreed to the employer's making the deduction at issue. Id., 156–57, 166.

Our Supreme Court in *Mytych* discussed the legislative purpose underpinning § 31-73 (b). It stated that the statute was intended to be remedial in nature "to prevent the employer from taking advantage of the legal agreement that *exists between the employer and the employee*" and "to protect the sanctity of *the wages earned by an employee* pursuant to the agreement she or he has made with her or his employer." (Emphasis added.) Id., 160–61. Discussing this court's decision in *Lockwood*, the Supreme Court stated: "The Appellate Court properly concluded that the language of § 31-73 (b) was clear and unambiguous in that it prohibits an employer from demanding any . . . sum of money or contribution from any person . . . upon the representation or the understanding that such . . . sum of money . . . is necessary to secure employment or continue in employment." (Internal quotation marks omitted.) Id., 166.[12] With the following legal background in mind, we turn to our discussion of the present case.

We conclude that the court properly granted the defendant's motion for summary judgment and denied the plaintiff's motion. We reach this conclusion for principally two reasons. First, we agree with the main thrust of the defendant's argument, advanced in support of its motion for summary judgment and in opposition to the plaintiff's motion, that § 31-73 is inapplicable to the undisputed facts of this case and, thus, cannot as a matter of law provide the basis for a wrongful termination action.[13] Second, and alternatively, even if we were to deem § 31-73 applicable under the facts presented, we agree with the trial court and the defendant that the plaintiff has failed to present evidence to support his assertion that the defendant actually violated § 31-73 and, thus, the public policy underlying the statute.

We start with the plaintiff's failure to demonstrate that the prohibitions described in § 31-73 are implicated by the undisputed facts of the present case. As indicated by the trial court, the material facts surrounding the plaintiff's termination are not in dispute. Furthermore, it is unnecessary for purposes of summary judgment

to consider the parties' dispute about whether the plaintiff's abrupt discharge was prompted entirely or only in part by his refusal to agree to share exam fees he would earn from his work as an FAA examiner.[14] The reason for this is because the dispositive threshold issue is whether the employer's attempts, coercive or otherwise, to get the plaintiff to agree to share in the exam fees—fees that constituted as yet unrealized proceeds of a business venture unrelated to any wages or other sums of money paid to the plaintiff by the defendant as part of their ongoing employment relationship—legally constituted an act that invaded the "sanctity of the wages earned by an employee . . . ." *Mytych* v. *May Dept. Stores Co.*, supra, 260 Conn. 161.

In other words, any request or demand of money made by the defendant in this case concerned funds that cannot reasonably be attributed to the existing employment relationship but, rather, involved negotiations related to a separate, albeit related, future business venture between the parties. The fact that such negotiation occurred in the context of an existing employer-employee relationship is not enough to bring such actions within the ambit of those that are prohibited by § 31-73. The plaintiff's argument that the defendant's onetime proposal of a potential fee sharing relationship falls within the type of coercive behavior that § 31-73 forbids is untenable. Rather, we agree with the trial court that the plaintiff advances an overly broad interpretation of § 31-73.[15]

Pursuant to the at-will employment doctrine, an employer is permitted to discharge an employee *for any reason*. One such permissible reason might be displeasure arising from an employee's refusal to participate in a future side business proposed by the employer. The employee may reject the proposal, choosing to go into business alone and not share any potential earnings with his employer. Regardless, the employer is justified in discharging an at-will employee for any reason, including anger or resentment over an employee's refusal of a business proposal. That is what the undisputed facts, viewed in the light most favorable to the plaintiff, demonstrate happened in the present case. An employer who discharges an at-will employee wholly on the basis of what, on the surface, might be viewed as "sour grapes," has not violated § 31-73 or any clear public policy that should subject the employer to a claim of wrongful termination of employment.

The evidence offered by the plaintiff demonstrates that the defendant made a single request to have him enter into an agreement to share in the proceeds of a future business venture. The plaintiff was free to reject the offer, and the defendant, under the at-will employment doctrine, was free to terminate the plaintiff's employment for his decision. The public policy inherent in § 31-73 (b) places a limit on the at-will employment

rule only by carving out an exception that prohibits an employer from coercing from an employee financial concessions related to wages by conditioning future employment or continued employment on the employee's capitulation to the employer's demands. As the trial court stated, "§ 31-73 (b) does not regulate an employer's reason for terminating an employee; it regulates the use of continued employment as leverage to extort a sum of money." We are aware of no court that has applied § 31-73 in the context of an employer's request to share an as-yet unrealized future sum of money. Because the record before the court established that § 31-73 was inapplicable and was the sole legal basis underlying the wrongful discharge count, the trial court properly rendered summary judgment in favor of the defendant.

We now turn to our second, alternative rationale for upholding the trial court's summary judgment. We conclude that, even if § 31-73 arguably is applicable as a matter of law, the evidence submitted by the plaintiff in support of his own motion for summary judgment and in opposition to the defendant's motion fails to raise a genuine issue of material fact that the defendant ever conditioned the plaintiff's continued employment on his acceptance of the defendant's fee sharing offer, a necessary element in the plaintiff's wrongful termination action predicated on a violation of § 31-73. Furthermore, because the public policy exception to the at-will employment doctrine is unquestionably a narrow one, we are unconvinced that the inference that the plaintiff urges us to draw solely from the temporal proximity between his rejection of the defendant's proposal and the termination of his employment is sufficient to trigger the exception.

The language of § 31-73 (b), which our Supreme Court has determined to be clear and unambiguous, provides that a violation of § 31-73 (b) requires more than a demand of a sum of money; rather, such a demand must be made "upon the *representation* or the *understanding* that [payment] is necessary to secure employment or continue in employment." (Emphasis added.) General Statutes § 31-73 (b). The plaintiff failed to present evidence of either a representation by the defendant that his continued employment hinged on his acceptance of the defendant's offer or an understanding reached by the parties to that effect.

Black's Law Dictionary defines a "representation" as a "presentation of fact—either by words or by conduct—made to induce someone to act." Black's Law Dictionary (11th Ed. 2019) p. 1556. We do not agree with the plaintiff that such a representation can be implied from the undisputed facts in the record presented. Although the defendant's proposal reasonably may be viewed as a demand or request for a sum of money, there was no contemporaneous conduct that

could be construed as an express or implied "represen-
tation" made to the plaintiff that his continued employ-
ment depended on his agreement to the fee splitting
proposal, nor was there evidence of other coercive con-
duct by the defendant. The plaintiff acknowledges that
the defendant never expressly threatened him with the
loss of his job if he refused the defendant's fee sharing
proposal. According to the plaintiff, the defendant
raised the possibility of a fee sharing arrangement only
one time. The plaintiff did not indicate at that time
whether he was interested in the defendant's proposal,
and the defendant never asked him again, sought any
commitment, or threatened retaliation of any kind. In
fact, despite the plaintiff's failure to agree with the
defendant's proposal when it was made, the plaintiff's
employment was not terminated immediately but,
rather, the plaintiff continued in the defendant's employ
for weeks. Those facts fall far short of the actions taken
by the defendant in *Lockwood*, in which the defendant
made repeated and explicit demands that the plaintiff
could not return to work unless he agreed to pay the
defendant's insurance deductible. See *Lockwood* v. *Pro-
fessional Wheelchair Transportation, Inc.*, supra, 37
Conn. App. 87–89.

Similarly, no evidence was submitted in the present
case in conjunction with the motions for summary judg-
ment that tended to demonstrate that the parties ever
reached any mutual "understanding" that the plaintiff's
agreement to the fee sharing arrangement was a condi-
tion of his continued employment. To the contrary,
as noted by the trial court, the only evidence of an
"understanding" between the parties was the statement
by Rhonda Boulette, who, in response to the plaintiff's
having indicated his reluctance to agree to the proposal,
stated, "that is fine. Don't worry about it."

The plaintiff suggests that a trier of fact reasonably
could infer from the termination of his employment
alone that the defendant had implicitly conditioned his
continued employment on his agreement with the
defendant's fee sharing proposal. We do not agree. As
stated by the trial court, the plaintiff failed to present
any evidentiary basis from which to conclude that the
defendant "ever actually used the prospect of renewed
or continued employment as leverage to achieve its
objective of obtaining a fee splitting agreement with
the plaintiff. It [simply] terminated him without further
discussion of the issue." That decision, whether well
thought out or reasonable, falls squarely within the type
of managerial discretion by an employer that the
Supreme Court in *Sheets* indicated did not warrant inter-
vention by a court. See *Sheets* v. *Teddy's Frosted Foods,
Inc.*, supra, 179 Conn. 477 (warning that "courts should
not lightly intervene to impair the exercise of manage-
rial discretion or to foment unwarranted litigation").

For the foregoing reasons, we agree with the trial

court's conclusion that the facts of this case, construed in the light most favorable to the plaintiff, do not raise a genuine issue of material fact that the defendant committed a violation of § 31-73 (b) or the important public policy embodied therein. Without evidence of a violation of a statutorily derived important public policy, the plaintiff's common-law wrongful discharge claim fails as a matter of law. Accordingly, we conclude that the court properly granted the defendant's motion for summary judgment with respect to count one of the operative complaint and denied the plaintiff's motion for summary judgment.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] General Statutes § 31-73, titled "Refund of wages for furnishing employment," provides: "(a) When used in this section, 'refund of wages' means: (1) The return by an employee to his employer or to any agent of his employer of any sum of money actually paid or owed to the employee in return for services performed or (2) payment by the employer or his agent to an employee of wages at a rate less than that agreed to by the employee or by any authorized person or organization legally acting on his behalf.

"(b) No employer, contractor, subcontractor, foreman, superintendent or supervisor of labor, acting by himself or by his agent, shall, directly or indirectly, demand, request, receive or exact any refund of wages, fee, sum of money or contribution from any person, or deduct any part of the wages agreed to be paid, upon the representation or the understanding that such refund of wages, fee, sum of money, contribution or deduction is necessary to secure employment or continue in employment. No such person shall require, request or demand that any person agree to make payment of any refund of wages, fee, contribution or deduction from wages in order to obtain employment or continue in employment. A payment to any person of a smaller amount of wages than the wage set forth in any written wage agreement or the repayment of any part of any wages received, if such repayment is not made in the payment of a debt evidenced by an instrument in writing, shall be prima facie evidence of a violation of this section.

"(c) The provisions of this section shall not apply to any deductions from wages made in accordance with the provisions of any law, or of any rule or regulation made by any governmental agency.

"(d) Any person who violates any provision of this section shall be fined not more than one hundred dollars or imprisoned not more than thirty days for the first offense, and, for each subsequent offense, shall be fined not more than five hundred dollars or imprisoned not more than six months or both."

[2] The parties each filed motions for summary judgment. The court granted the defendant's motion for summary judgment and denied the plaintiff's motion for summary judgment. Our review of the court's summary judgment rendered in favor of the defendant is dispositive of this appeal as to both motions. See footnote 7 of this opinion. Although the denial of a motion for summary judgment is not ordinarily a final judgment and, thus, not immediately appealable, "if parties file . . . motions for summary judgment and the court grants one and denies the other, this court has jurisdiction to consider both rulings on appeal." *Hannaford* v. *Mann*, 134 Conn. App. 265, 267 n.2, 38 A.3d 1239, cert. denied, 304 Conn. 929, 42 A.3d 391 (2012).

[3] As reflected in the record, in order to have an FAA flight examiner designated as an on-staff examiner as opposed to an independent examiner, the defendant, in addition to the individual examiner, would have been required to obtain examination authority from the FAA. The defendant never obtained such examination authority.

[4] The defendant's students would pay the defendant to rent a helicopter for the exam, but they would pay the FAA examiner directly for his or her services. If the defendant had a staff member who also was a certified examiner, it could capitalize on that fact as a marketing tool to attract more students and increase business. Further, by splitting the exam fee with the plaintiff, the defendant hoped to be able to refund that portion of the fee to its students. From the plaintiff's perspective, certification by the FAA as an examiner would mean an additional, independent stream of income in

the form of exam fees, and his continued association with the defendant would provide him with access to student helicopter pilots interested in FAA certification. He would also generate additional fees by administering exams at other locations, just as other FAA examiners had done for years with respect to the defendant's students.

[5] A copy of the text message chain, which the plaintiff submitted in support of his motion for summary judgment, reveals the following colloquy:

"[Rhonda Boulette]: Tim. I'm going through the credit cards and I see nothing from OK City. What's up? You didn't use our card?

"[The Plaintiff]: No, I paid for it all myself.

"[Rhonda Boulette]: Why? That should be a deduction for school expenses.

"[The Plaintiff]: When I originally asked John if he wanted to pay for the trip I told him I'd pay him back. Then he told me he wanted me to give him [one half of] my examiner money. I decided to just keep them separate and pay for it myself.

"[Rhonda Boulette]: Oh. John said clean out your desk you do not work for [the defendant] anymore.

"[The Plaintiff]: Will do."

[6] General Statutes § 31-72 provides in relevant part: "When any employer fails to pay an employee wages in accordance with the provisions of sections 31-71a to 31-71i, inclusive . . . such employee . . . shall recover, in a civil action, (1) twice the full amount of such wages, with costs and such reasonable attorney's fees as may be allowed by the court, or (2) if the employer establishes that the employer had a good faith belief that the underpayment of wages was in compliance with law, the full amount of such wages or compensation, with costs and such reasonable attorney's fees as may be allowed by the court. . . ."

[7] Because the court's decision disposed only of one of the two counts brought by the plaintiff against the defendant, the court's ruling on the motions for summary judgment was not an immediately appealable final judgment. See Practice Book § 61-4. The plaintiff filed a notice of intent to appeal on September 10, 2019, although such notice was unnecessary. See Practice Book § 61-5 (indicating that "use of the notice of intent to appeal is abolished in all instances except" to defer filing of appeal from judgment described in Practice Book §§ 61-2 and 61-3, neither of which was applicable to judgment rendered by court in present case). On November 8, 2019, however, the plaintiff withdrew count two of the complaint. Because all counts of the complaint were disposed of as a result of that withdrawal, the result was an appealable final judgment. See Practice Book § 61-2; *Sicaras* v. *Hartford*, 44 Conn. App. 771, 775, 692 A.2d 1290 ("[w]ithdrawals are analogous to final judgments"), cert. denied, 241 Conn. 916, 696 A.2d 340 (1997). The plaintiff timely filed the present appeal on November 12, 2019.

[8] The plaintiff further claims that the court improperly denied his motion for summary judgment with respect to the defendant's claim of entitlement to a setoff. We decline to review that claim in light of our disposition of this appeal. "The concept of setoff allows [parties] that owe each other money to apply their mutual debts against each other, thus avoiding the absurdity of making A pay B when B in fact owes A." (Internal quotation marks omitted.) *Mariculture Products Ltd.* v. *Certain Underwriters at Lloyd's of London*, 84 Conn. App. 688, 703, 854 A.2d 1100, cert. denied, 272 Conn. 905, 863 A.2d 698 (2004); see id. (explaining that defendant will plead right of setoff "either to reduce the plaintiff's recovery, or to defeat it altogether, and, as the case may be, to recover a judgment in his own favor for a balance" (internal quotation marks omitted)). Because we affirm the court's decision to render summary judgment in favor of the defendant on count one of the complaint and the plaintiff has withdrawn count two, there can be no monetary judgment for the plaintiff subject to the defendant's asserted right to a setoff. See 20 Am. Jur. 2d 271, Counterclaim, Recoupment, and Setoff § 8 (2021) ("setoff is not available when the plaintiff has no cause of action"). Furthermore, even if adjudication of the setoff claim were still possible despite our disposition of the plaintiff's claim on count one, the defendant has not raised on appeal any claim to a right to further adjudication of the setoff by the court in the absence of a remand by this court for further proceedings on the complaint should the plaintiff prevail on appeal. Accordingly, because no such remand is ordered, we treat the setoff as abandoned. To the extent that the defendant believes it is entitled to satisfaction of a debt allegedly owed to it by the plaintiff, it may seek whatever legal remedies remain available to it in a separate action.

[9] "When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In other words,

we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply. . . . General Statutes § 1-2z directs this court to first consider the text of the statute and its relationship to other statutes to determine its meaning. If, after such consideration, the meaning is plain and unambiguous and does not yield absurd or unworkable results, we shall not consider extratextual evidence of the meaning of the statute. . . . Only if we determine that the statute is not plain and unambiguous or yields absurd or unworkable results may we consider extratextual evidence of its meaning such as the legislative history and circumstances surrounding its enactment . . . the legislative policy it was designed to implement . . . its relationship to existing legislation and [common-law] principles governing the same general subject matter . . . . The test to determine ambiguity is whether the statute, when read in context, is susceptible to more than one reasonable interpretation. . . . We presume that the legislature did not intend to enact meaningless provisions. . . . [S]tatutes must be construed, if possible, such that no clause, sentence or word shall be superfluous, void or insignificant . . . ." (Internal quotation marks omitted.) *Kayla M.* v. *Greene*, supra, 163 Conn. App. 499–500. "Moreover, when . . . a statute does not define a term, we may look to the dictionary to determine the commonly approved meaning of the term." *Board of Selectmen* v. *Freedom of Information Commission*, 294 Conn. 438, 449, 984 A.2d 748 (2010); see also General Statutes § 1-1 (a).

[10] In *Thibodeau* v. *Design Group One Architects, LLC*, supra, 260 Conn. 691, our Supreme Court emphasized the limitations of the public policy exception, citing to a number of cases in which it previously had found "no statutorily based expression of public policy sufficient to warrant an exception to the at-will employment doctrine." Id., 701. For example, in *Burnham* v. *Karl & Gelb, P.C.*, 252 Conn. 153, 161, 745 A.2d 178 (2000), it had determined that the plaintiff failed to state a claim of common-law wrongful discharge because the allegations of retaliatory discharge failed to satisfy the requirements of the particular statute on which the claim was based. In *Daley* v. *Aetna Life & Casualty Co.*, 249 Conn. 766, 804, 734 A.2d 112 (1999), the court held that the plaintiff could not prevail on a claim that a public policy required all employers to provide working parents with flexible work schedules because such an accommodation was not statutorily mandated. In *Carbone* v. *Atlantic Richfield Co.*, 204 Conn. 460, 468–70, 528 A.2d 1137 (1987), our Supreme Court determined that an oil company employee whose employment was terminated because he failed to obtain accurate information regarding the pricing practices of the employer's competitors failed to allege facts necessary to support a claim that the termination of his employment violated any statutorily expressed public policy. Finally, in *Morris* v. *Hartford Courant Co.*, supra, 200 Conn. 680, the court held that no statutory provision obligated the plaintiff's employer, as a matter of public policy, to investigate the veracity of an accusation of criminal conduct that the employer had used as a basis for the termination of the plaintiff's employment.

[11] Although recognizing the principle that an administrative agency charged with a statute's enforcement ordinarily is entitled to considerable deference regarding that statute's construction, this court noted that "the construction of a statute on an issue that has not previously been subjected to judicial scrutiny is a question of law on which an administrative ruling is not entitled to special deference." (Internal quotation marks omitted.) *Lockwood* v. *Professional Wheelchair Transportation, Inc.*, supra, 37 Conn. App. 93. Because, at the time of the *Lockwood* decision, § 31-73 had never been subject to judicial interpretation, we concluded that it was "within the authority of this court to construe the statute in a manner consistent with its language and purpose" if the "administrative interpretations lead to a result that is contrary to the language and purpose of the statute . . . ." Id. Although an opinion of the attorney general is always highly persuasive authority entitled to careful consideration by courts; see *Wiseman* v. *Armstrong*, 269 Conn. 802, 825, 850 A.2d 114 (2004); it is not at all clear from the text of § 31-73 that the Office of the Attorney General is the agency charged with the enforcement of the statute, including the power to seek the criminal sanctions provided for in subsection (d) of the statute.

[12] We note that, in 2007, the attorney general had occasion to release a formal legal opinion discussing, inter alia, whether an employer of a state legislator could enter into an agreement with the legislator-employee "permitting him to be paid his full salary, but requiring him to bear the cost of training and compensating a third party to perform his duties [for the

employer] if he is absent from work due to legislative obligations." Opinions, Conn. Atty. Gen. No. 2007-033 (December 17, 2007) p. 1. The concern addressed by the attorney general in his opinion was whether requiring the legislator-employee "effectively to forfeit a portion of his wages constitutes a violation of [General Statutes] §§ 2-3a, 31-71e, or 31-73." Id.

The attorney general described § 31-73 as "prohibit[ing] an employer from requiring an employee to refund wages already paid in order to keep his job." Id., p. 4. After considering the decisions in *Lockwood* and *Mytych*, the attorney general stated that those cases make clear that the employer and legislator-employee could enter into a voluntary agreement establishing a formula for calculating the employee's future wages without violating § 31-73 as long as that voluntary agreement did not violate § 2-3a. Id., p. 5. Relevant to the present case, the attorney general seemed to recognize that negotiations between an employer and employee affecting future wages would not implicate § 31-73, which is concerned with wages already paid or earned and owing.

[13] For his part, the plaintiff claims that, not only does the statute apply as a matter of law, but that what he perceives as admissions in the depositions of the parties established a prima facie case of wrongful discharge that warranted the rendering of summary judgment in his favor. Because our resolution of the plaintiff's claim directed at the court's rendering of summary judgment in favor of the defendant is fully dispositive of the wrongful termination count, it is unnecessary to address the plaintiff's claim that the court improperly denied his motion for summary judgment on that same count.

[14] As stated by the trial court: "Despite [the defendant's] claim that other considerations motivated it to fire the plaintiff, there is evidence to support the plaintiff's claim that he was fired for refusing to share the examination fees, and the court, for purposes of summary judgment, must assume that [the defendant] fired the plaintiff for that reason."

[15] We also agree with the trial court's cogent analysis that "[the defendant] was not proposing a 'refund of wages' or anything analogous to that when it proposed the fee splitting arrangement. . . . [The defendant] undoubtedly considered the plaintiff's access to its customers a valuable asset to the plaintiff's proposed new business. [The defendant's] desire to be compensated for the value it would bring to the plaintiff's business should not be viewed, from a legal standpoint, as a prohibited attempt to recoup wages earned by the plaintiff through his work for [the defendant]. Such a broad interpretation of the statute's reference to 'a sum of money' would chill the discussion of any prospective new business arrangements between employers and employees. Employers would be deterred from engaging in such discussions with an employee by the prospect that it might result in nothing more than unlimited tenure for the employee. It does not appear to the court that the legislature meant to create such a disincentive to entrepreneurship by enacting the statute and providing that one who violates it is subject to a fine and/or imprisonment."